**BERKEY PHOTO, INC., Plaintiff-Appellee-Cross Appellant,**

v.

**EASTMAN KODAK COMPANY, Defendant-Appellant-Cross Appellee.**

**Nos. 1019, 1070, Dockets 78–7445, 78–7448.**

United States Court of Appeals, Second Circuit.

Argued April 18, 1979.

Submitted April 30, 1979.

Decided June 25, 1979.

 

Alvin M. Stein, New York City (Barry J. Brett, Mark I. Schlesinger, Aurora Cassirer, Mark D. Offen, Parker, Chapin, Flattau & Klimpl, New York City, Neuman, Williams, Anderson & Olson, Chicago, Ill., of counsel), for plaintiff-appellee-cross appellant.

William Piel, Jr., New York City (Robert MacCrate, John L. Warden, Richard E. Carlton, Jerrold J. Ganzfried, Philip K. Howard, Shelley D. LaVine, William L. Farris, Sullivan & Cromwell, New York City, of counsel), for defendant-appellant-cross appellee.

Before KAUFMAN, Chief Judge, and SMITH and MULLIGAN, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

## INTRODUCTION

To millions of Americans, the name Kodak is virtually synonymous with photography. Founded over a century ago by George Eastman, the Eastman Kodak Company has long been the preeminent firm in the amateur photographic industry. It provides products and services covering every step in the creation of an enduring photographic record from an evanescent image. Snapshots may be taken with a Kodak camera on Kodak film, developed by Kodak's Color Print and Processing Laboratories, and printed on Kodak photographic paper. The firm has rivals at each stage of this process, but in many of them it stands, and has long stood, dominant. It is one of the giants of American enterprise, with international sales of nearly $6 billion in 1977 and pre-tax profits in excess of $1.2 billion.

This action, one of the largest and most significant private antitrust suits in history, was brought by Berkey Photo, Inc., a far smaller but still prominent participant in the industry. Berkey competes with Kodak in providing photofinishing services—the conversion of exposed film into finished prints, slides, or movies. Until 1978, Berkey sold cameras as well. It does not manufacture film, but it does purchase Kodak film for resale to its customers, and it also buys photofinishing equipment and supplies, including color print paper, from Kodak.

The two firms thus stand in a complex, multifaceted relationship, for Kodak has been Berkey's competitor in some markets and its supplier in others. In this action, Berkey claims that every aspect of the association has been infected by Kodak's monopoly power in the film, color print paper, and camera markets, willfully acquired, maintained, and exercised in violation of § 2 of the Sherman Act, 15 U.S.C. § 2. It also charges that Kodak conspired with flash-lamp manufacturers in violation of § 1 of the Act, 15 U.S.C. § 1. Berkey alleges that these violations caused it to lose sales in the camera and photofinishing markets and to

pay excessive prices to Kodak for film, color print paper, and photofinishing equipment.[1] A number of the charges arise from Kodak's 1972 introduction of the 110 photographic system, featuring a "Pocket Instamatic" camera and a new color print film, Kodacolor II, but the case is not limited to that episode. It embraces many of Kodak's activities for the last decade and, indeed, from preceding years as well.

After more than four years of pretrial maneuvering, the trial got under way in July 1977 before Judge Marvin E. Frankel of the Southern District of New York. Despite the daunting complexity of the case— the exhibits numbered in the thousands— Kodak demanded a jury. Accordingly, the trial was conducted in two parts, one to determine liability and the other to measure damages. It ran continuously, except for a one-month hiatus between the two segments, until the final verdict was rendered on March 22, 1978. The liability phase of the trial by itself consumed more than six months, and the damages aspect required approximately another month. Except for a few specific questions relating primarily to market definitions, the jury was asked to render what was essentially a general verdict on each count.

After deliberating for eight days on liability and five on damages, the jury found for Berkey on virtually every point, awarding damages totalling $37,620,130. Judge Frankel upheld verdicts aggregating $27,-154,700 for lost camera and photofinishing sales and for excessive prices on film and photofinishing equipment, but he entered judgment n. o. v. for Kodak on the remainder. Trebled and supplemented by attorneys' fees and costs pursuant to § 4 of the Clayton Act, 15 U.S.C. § 15, Berkey's judgment reached a grand total of $87,091,-

309.47, with interest, of course, continuing to accrue.

Kodak now appeals this judgment, as well as the two forms of equitable relief that we shall discuss below. It challenges virtually every aspect of the district court proceedings, from the theories of liability and damages presented to the jury to the sufficiency of the evidence to sustain them. It argues, furthermore, that Judge Frankel committed prejudicial error in the conduct of the trial. For its part, Berkey contends that the trial judge erred in not entering judgment on the full amount of the jury's verdict and in computing improperly the costs and fees that Berkey should recover.

Resolution of these competing claims requires us to settle a number of important and novel issues concerning § 2 of the Sherman Act. We believe that the district court committed several significant errors as it charted its course through the complexities of this case, and we are therefore compelled to reverse the judgment below in certain major respects. But we cannot accept Kodak's contention that a properly charged jury could not find monopolization of any of the relevant markets and resulting damage to Berkey. Accordingly, we remand for a new trial on several of the claims.

## I. THE AMATEUR PHOTOGRAPHIC INDUSTRY

Before plunging into the welter of issues raised in this appeal, we must understand the industry out of which the litigation arose. It is, of course, a basic principle in the law of monopolization that the first step in a court's analysis must be a definition of the relevant markets. *See, e. g., United States v. E. I. du Pont de Nemours & Co.,* 351 U.S. 377, 391–93, 76 S.Ct. 994,

---

1. Berkey had charged several other violations that are not before us on this appeal. During the liability trial, Berkey withdrew or the court dismissed claims under the Clayton Act, §§ 3 & 7, 15 U.S.C. §§ 14 & 18, as well as allegations arising from some of Kodak's early acquisitions, its use of patents, its relations with Polaroid Corp., and its other activities in the instant photography field. Despite jury findings of § 2 liability, Berkey did not attempt to prove

damages with respect to color negative printers and chemicals, and the jury found no damages with respect to amateur movie cameras. Kodak's purchases of flashcubes, magicubes, and flipflash arrays led to a $245,100 jury verdict under the Robinson-Patman Act, § 2(f), 15 U.S.C. § 13(f), which was set aside by Judge Frankel because there was no evidence of injury to Berkey.

100 L.Ed. 1264 (1956). Although Kodak does not now challenge the jury's delineation of the markets, a survey of this terrain remains essential. The jury found monopolization or other anticompetitive conduct in no fewer than five distinct markets within the amateur photographic industry, and in several instances Kodak was held to have misused its control over one market to disadvantage rivals in another. Accordingly, to evaluate the verdicts, it is necessary to describe not only the individual markets but also the interrelationships among them.

The principal markets relevant here, each nationwide in scope, are amateur conventional still cameras, conventional photographic film, photofinishing services, photofinishing equipment, and color print paper. The numerous technological interactions among the products and services constituting these markets are manifest. To take an obvious example, not only are both camera and film required to produce a snapshot, but the two must be in compatible "formats." This means that the film must be cut to the right size and spooled in a roll or cartridge that will fit the camera mechanism. Berkey charges that Kodak refused to supply on economical terms film usable with camera formats designed by other manufacturers, thereby exploiting its film monopoly to obstruct its rivals in the camera market. Similarly, Berkey contends, since the emulsions and other constituents of a film determine the chemicals and processes required to develop it, Kodak was able to project its power over film into the photofinishing market as well.

These and other market interactions will be discussed in depth as we analyze the verdicts and rulings below. First, however, we must describe in detail the individual markets themselves.

## A. The Camera Market

The "amateur conventional still camera" market now consists almost entirely of the so-called 110 and 126 instant-loading cameras. These are the direct descendants of the popular "box" cameras, the best-known of which was Kodak's so-called "Brownie." Small, simple, and relatively inexpensive, cameras of this type are designed for the mass market rather than for the serious photographer.[2]

Kodak has long been the dominant firm in the market thus defined. Between 1954 and 1973 it never enjoyed less than 61% of the annual unit sales, nor less than 64% of the dollar volume, and in the peak year of 1964, Kodak cameras accounted for 90% of market revenues. Much of this success is no doubt due to the firm's history of innovation. In 1963 Kodak first marketed the 126 "Instamatic" instant-loading camera,[3] and in 1972 it came out with the much smaller 110 "Pocket Instamatic." Not only are these cameras small and light, but they employ film packaged in cartridges that can simply be dropped in the back of the camera, thus obviating the need to load and position a roll manually. Their introduction triggered successive revolutions in the industry. Annual amateur still camera sales in the United States averaged 3.9 million units between 1954 and 1963, with little annual variation. In the first full year after Kodak's introduction of the 126, industry sales leaped 22%, and they took an even larger quantum jump when the 110 came to market. Other camera manufacturers, including Berkey, copied both these inventions but for several months after each introduction anyone desiring to purchase a camera in the new format was perforce remitted to Kodak.

Berkey has been a camera manufacturer since its 1966 acquisition of the Keystone Camera Company, a producer of movie

---

**2.** More complicated cameras, such as those in the 135 format ("35-millimeter") commonly used by professionals and photographic hobbyists, were found not to be part of this market. The jury also rejected Kodak's request to include in the definition "instant" cameras, pioneered by the Polaroid Corporation, which pro-

duce a finished print within minutes, or even seconds, after the shutter is snapped.

**3.** Instant-loading cameras are not to be confused with the "instant" cameras referred to in the previous footnote.

cameras and equipment.[4] In 1968 Berkey began to sell amateur still cameras made by other firms, and the following year the Keystone Division commenced manufacturing such cameras itself. From 1970 to 1977, Berkey accounted for 8.2% of the sales in the camera market in the United States,[5] reaching a peak of 10.2% in 1976. In 1978, Berkey sold its camera division and thus abandoned this market.

## B. *The Film Market*

The relevant market for photographic film comprises color print, color sl. le, color movie, and black-and-white film.[6] Kodak's grip on this market is even stronger than its hold on cameras. Since 1952, its annual sales have always exceeded 82% of the nationwide volume on a unit basis, and 88% in revenues. Foreign competition has recently made some inroads into Kodak's monopoly, but the Rochester firm concedes that it dominated film sales throughout the period relevant to this case. Indeed, in his summation, Kodak's trial counsel told the jury that "the film market . . . has been a market where there has not been price competition and where Kodak has been able to price its products pretty much without regard to the products of competitors."

Kodak's monopoly in the film market is particularly important to this case, because the jury accepted Berkey's contention, noted above, that it had been used to disadvantage rivals in cameras, photofinishing, photofinishing equipment, and other markets.

Of special relevance to this finding is the color print film segment of the industry, which Kodak has dominated since it introduced "Kodacolor," the first amateur color print film, in 1942.[7] In 1963, when Kodak announced the 126 Instamatic camera, it also brought out a new, faster color print film—Kodacolor X—which was initially available to amateur photographers only in the 126 format.[8] Nine years later, Kodak repeated this pattern with the simultaneous introduction of the 110 Pocket Instamatic and Kodacolor II film. For more than a year, Kodacolor II was made only for 110 cameras, and Kodak has never made any other color print film in the 110 size.

## C. *Photofinishing Services and Photofinishing Equipment*

Before 1954, Kodak's Color Print and Processing Laboratories (CP&P) had a nearly absolute monopoly of color photofinishing maintained by a variety of practices. Accounting for over 95% of color film sales, Kodak sold every roll with an advance charge for processing included. Consumers had little choice but to purchase Kodak film, and in so doing they acquired the right to have that film developed and printed by CP&P at no further charge. Since few customers would duplicate their costs to procure the services of a non-Kodak photofinisher, Kodak was able to parlay its film monopoly to achieve equivalent market power in photofinishing.[9]

4. In 1967 Berkey acquired a manufacturer of amateur photographic accessories, the Atlas-Warner Corp., along with three distributors of Atlas-Warner products.

5. Berkey entered into the manufacture of instant cameras in 1972, but discontinued this line in settlement of patent litigation instituted by Polaroid Corp.

6. The jury included movie film and 35-millimeter film in this market, presumably because they are substantially identical to the film used in amateur still cameras. Instant film, however, a product chemically distinct from laboratory-processed film, was excluded.

7. Kodak marketed improved versions of Kodacolor in 1945, 1949, and 1955.

8. The new film was also initially sold for use in 35-millimeter cameras, which are not part of the amateur market. It did not replace Kodacolor in the amateur 127 and 620 sizes until one year later. "Film speed" refers to an emulsion's sensitivity to light. Thus Kodacolor X—as compared to its predecessor—could produce acceptable images under markedly inferior lighting conditions.

9. To be sure, Kodak could not in this fashion control the market for color reprints—production of additional prints from slides or negatives. Here it resorted to other tactics. By refusing to sell the special paper or chemicals necessary to produce such reprints to rival photofinishers, it ensured—since there was no other adequate source for these supplies—that even this segment of the market did not escape its grip.

This film/processing "tie-in" attracted the attention of the Justice Department, and in 1954 a consent decree changed the structure of the color photofinishing market drastically. Kodak was forbidden to link photofinishing to film sales, and it agreed to make its processing technology, chemicals, and paper available to rivals at reasonable rates. As a result, CP&P's share of the market plummeted from 96% in 1954 to 69% two years later, and it has declined sharply ever since. In 1970, CP&P accounted for but 17% of the market, and by 1976 its share reached a low of 10%. There are now approximately 600 independent photofinishers in the United States.

Berkey is one of the largest of these processors. It has been a photofinisher since 1933, but until 1954 its principal business was developing and printing black-and-white film.[10] In addition, Berkey purchased Kodak black-and-white film, which was sold without a processing tie-in, for resale to its photofinishing customers. After the 1954 decree, Berkey applied to Kodak for the appropriate licenses and in 1956 began to process significant amounts of color film. It now finishes more 126 and 110 color print film than does Kodak.

A variety of equipment is used to process film, and the Kodak Apparatus Division (KAD) designs and produces most of the machinery used by CP&P. Kodak also sells some equipment to other photofinishers, but this is an insignificant portion of its business; indeed, until the introduction of the 110 system, Kodak made still film processing equipment for its own use only. Several other firms supply photofinishing equipment to the rival processors, and Berkey does not contend that Kodak monopolized or attempted to monopolize this market.

### D. The Color Paper Market

The market for color paper—that is, paper specially treated so that images from color film may be printed on it—effectively came into being after entry of the 1954

consent decree. Before then, Kodak was for all practical purposes the only color photofinisher, and its requirements for color paper were met entirely by the paper division of Kodak Park Works in Rochester. The remaining processors, who dealt with non-Kodak color film and used non-Kodak paper, occupied only four percent of the color photofinishing market. Consequently, the vertical foreclosure created by CP&P's lock on photofinishing and its exclusive use of Kodak color paper was virtually complete.

Although the 1954 decree steadily loosened Kodak's grip in photofinishing, it did not immediately affect the firm's control of color paper. For more than a decade, the independent photofinishers that sprang up after the decree was entered looked only to Kodak for their paper supplies. Indeed, although entry by both foreign and domestic paper manufacturers has reduced Kodak's share substantially, to a low of 60% in 1976, the firm's color paper operations have remained remarkably profitable. Between 1968 and 1975, while its market share was falling from 94% to 67%, Kodak's earnings from operations as a percentage of sales remained virtually constant, averaging 60% for the period. Moreover, the most recent telling event in the market has not been entry but exit: GAF Corporation announced in 1977 that it was abandoning its effort to sell color paper, leaving Kodak with only one domestic and two foreign competitors.

Kodak, then, is indeed a titan in its field, and accordingly has almost inevitably invited attack under § 2 of the Sherman Act. Few, if any, cases have presented so many diverse and difficult problems of § 2 analysis. It is appropriate, therefore, to elucidate some fundamental principles of law relating to that statutory provision.

### II. § 2 OF THE SHERMAN ACT

The Sherman Antitrust Act of 1890 has been characterized as "a charter of free-

---

**10.** Prior to 1954 a small part of Berkey's business consisted of processing Anscocolor film—manufactured by a rival of Kodak's, Ansco—into both slides and color prints. Using paper and chemicals supplied by Ansco, Berkey was also able to produce color prints from Kodachrome slides.

dom," *Appalachian Coals, Inc. v. United States,* 288 U.S. 344, 359, 53 S.Ct. 471, 77 L.Ed. 825 (1933). For nearly ninety years it has engraved in law a firm national policy that the norm for commercial activity must be robust competition. The most frequently invoked section of the Act is the first, which forbids contracts, combinations, or conspiracies in restraint of trade. But the prohibition of § 1 is incomplete, *Standard Oil Co. of New Jersey v. United States,* 221 U.S. 1, 60–61, 31 S.Ct. 502, 55 L.Ed. 619 (1911), for it only applies to conduct by two or more actors. If sufficiently powerful, however, a single economic entity may also stifle competition. 1 R. Callmann, *The Law of Unfair Competition, Trademarks, and Monopolies* 341–42 (3d ed. 1967). Accordingly, in § 2 of the Sherman Act, Congress made it unlawful to "monopolize, or attempt to monopolize, or combine or conspire . . . to monopolize" any part of interstate or foreign commerce. It is § 2 to which we give our principal attention in analyzing this case.

In passing the Sherman Act, Congress recognized that it could not enumerate all the activities that would constitute monopolization. Section 2, therefore, in effect conferred upon the federal courts "a new jurisdiction to apply a 'common law' against monopolizing." 3 P. Areeda & D. Turner, *Antitrust Law* 40 (1978). In performing that task, the courts have enunciated certain principles that by now seem almost elementary to any student of antitrust law. But, because § 2 must reconcile divergent and sometimes conflicting policies, it has been difficult to synthesize the parts into a coherent and consistent whole. To provide a framework for deciding the issues presented by this case, therefore, we begin by stating what we conceive to be the fundamental doctrines of § 2.

### A. *Monopoly Power as the Essence of the § 2 Violation*

■ The gravamen of a charge under § 1 of the Sherman Act is conduct in restraint of trade; no fundamental alteration of market structure is necessary. Thus, certain restrictive practices among competitors, such as price fixing, are illegal *per se.* That the conspirators lack the market power to affect prices is immaterial. *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 224 n.59, 60 S.Ct. 811, 84 L.Ed. 1139 (1940). Section 2, by contrast, is aimed primarily not at improper conduct but at a pernicious market structure in which the concentration of power saps the salubrious influence of competition.

■ Indeed, there is little argument over the principle that existence of monopoly power—"the power to control prices or exclude competition," *E. I. du Pont de Nemours & Co., supra,* 351 U.S. at 391, 76 S.Ct. at 1005—is "the primary requisite to a finding of monopolization." 1 M. Handler, *Twenty-five Years of Antitrust* 691 (1973). The Supreme Court has informed us that "monopoly power, whether lawfully or unlawfully acquired, may itself constitute an evil and stand condemned under § 2 even though it remains unexercised." *United States v. Griffith,* 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 236 (1948).

This tenet is well grounded in economic analysis. There is little disagreement that a profit-maximizing monopolist will maintain his prices higher and his output lower and the socially optimal levels that would prevail in a purely competitive market. *E. g.,* F. Scherer, *Industrial Market Structure and Economic Performance* 13–19 (1970). The price excess represents not a reasonable return on investment but the spoils of the monopolist's power. *E.g.,* L. Sullivan, *Handbook of the Law of Antitrust* 25–26 (1977); 2 P. Areeda & D. Turner, *supra,* at 323–34.

■ It is not a defense to liability under § 2 that monopoly power has not been used to charge more than a competitive price or extract greater than a reasonable profit. Learned Hand stated the rationale in the *Alcoa* case, *United States v. Aluminum Co. of America,* 148 F.2d 416, 427 (2d Cir. 1945). He said in his incisive manner that the Sherman Act is based on the belief:

that possession of unchallenged economic power deadens initiative, discourages thrift and depresses energy; that immu-

nity from competition is a narcotic, and rivalry is a stimulant, to industrial progress; that the spur of constant stress is necessary to counteract an inevitable disposition to let well enough alone.

Judge Hand explained, in addition, that Congress was not "actuated by economic motives alone" in enacting § 2. *Id.* Considerations of political and social policy form a major part of our aversion to monopolies, for concentration of power in the hands of a few obstructs opportunities for the rest.

Because, like all power, it is laden with the possibility of abuse; because it encourages sloth rather than the active quest for excellence; and because it tends to damage the very fabric of our economy and our society, monopoly power is "inherently evil." *United States v. United Shoe Machinery Corp.*, 110 F.Supp. 295, 345 (D.Mass. 1953), *aff'd per curiam*, 347 U.S. 521, 74 S.Ct. 699, 99 L.Ed. 910 (1954); *see United States v. Grinnell Corp.*, 236 F.Supp. 244, 258 (D.R.I. 1964), *aff'd in part*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). If a finding of monopoly power were all that were necessary to complete a violation of § 2, our task in this case would be considerably lightened. Kodak's control of the film and color paper markets clearly reached the level of a monopoly. And, while the issue is a much closer one, it appears that the evidence was sufficient for the jury to find that Kodak possessed such power in the camera market as well.[11] But our inquiry into Kodak's liability cannot end there.

### B. *The Requirement of Anticompetitive Conduct*

Despite the generally recognized evils of monopoly power, it is "well settled," *see* J. von Kalinowski, *Antitrust Laws & Trade Regulation* ¶ 802(3), at 8–41 (1979), that § 2 does not prohibit monopoly *simpliciter*—or, as the Supreme Court phrased it in the early landmark case of *Standard Oil Co. of New Jersey, supra*, 221 U.S. at 62, 31 S.Ct. 502, "monopoly in the concrete."

Thus, while proclaiming vigorously that monopoly power is the evil at which § 2 is aimed, courts have declined to take what would have appeared to be the next logical step—declaring monopolies unlawful *per se* unless specifically authorized by law. To understand the reason for this, one must comprehend the fundamental tension—one might almost say the paradox—that is near the heart of § 2. This tension creates much of the confusion surrounding § 2. It makes the cryptic *Alcoa* opinion a litigant's wishing well, into which, it sometimes seems, one may peer and find nearly anything he wishes.

The conundrum was indicated in characteristically striking prose by Judge Hand, who was not able to resolve it. Having stated that Congress "did not condone 'good trusts' and condemn 'bad' ones; it forbad all," *Alcoa, supra*, 148 F.2d at 427, he declared with equal force, "The successful competitor, having been urged to compete, must not be turned upon when he wins," *id.* at 430. Hand, therefore, told us that it would be inherently unfair to condemn success when the Sherman Act itself mandates competition. Such a wooden rule, it was feared, might also deprive the leading firm in an industry of the incentive to exert its best efforts. Further success would yield not rewards but legal castigation. The antitrust laws would thus compel the very sloth they were intended to prevent. We must always be mindful lest the Sherman Act be invoked perversely in favor of those who seek protection against the rigors of competition. *E.g., Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48 (2d Cir. 1979).

In *Alcoa* the crosscurrents and pulls and tugs of § 2 law were reconciled by noting

---

11. See our discussion of the relevant markets, Part I *supra*. Kodak sold approximately two-thirds of all amateur conventional still cameras throughout most of the relevant period. The frequency with which flashlamp manufacturers approached Kodak with suggestions for joint development of products and their willingness to acquiesce in arguably one-sided agreements is further evidence of Kodak's power in the camera market. See our discussion of Berkey's § 1 allegations, Part V *infra*. The precipitous decline, beginning in 1976, of Kodak's share of the camera market was evidence that the jury could consider, although it was not dispositive.

that, although the firm controlled the aluminum ingot market, "it may not have achieved monopoly; monopoly may have been thrust upon it." 148 F.2d at 429. In examining this language, which would condemn a monopolist unless it is "the passive beneficiary of a monopoly," *id.* at 430, we perceive Hand the philosopher. As an operative rule of law, however, the "thrust upon" phrase does not suffice. It has been criticized by scholars, 3 P. Areeda & D. Turner, *supra,* at 20; L. Sullivan, *supra,* at 96–97; Handler, *Some Unresolved Problems of Antitrust,* 62 Colum.L.Rev. 930, 934 (1962), and the Supreme Court appears to have abandoned it. *See United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); 1 M. Handler, *supra,* at 692. *Grinnell* instructs that after possession of monopoly power is found, the second element of the § 2 offense is "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." 384 U.S. at 570–71, 86 S.Ct. at 1704.

This formulation appears to square with the understanding of the draftsmen of the Sherman Act that § 2 does not condemn one "who merely by superior skill and intelligence . . . got the whole business because nobody could do it as well." *United Shoe Machinery Corp., supra,* 110 F.Supp. at 341 (quoting legislative history). Thus the statement in *Alcoa* that even well-behaved monopolies are forbidden by § 2 must be read carefully in context. Its rightful meaning is that, if monopoly power has been acquired or maintained through improper means, the fact that the power has not been used to extract improper benefits provides no succor to the monopolist.

But the law's hostility to monopoly power extends beyond the means of its acquisition. Even if that power has been legitimately acquired, the monopolist may not wield it to prevent or impede competition. Once a firm gains a measure of monopoly power,

whether by its own superior competitive skill or because of such actions as restrictive combinations with others, it may discover that the power is capable of being maintained and augmented merely by using it. *E. g., Lorain Journal Co. v. United States,* 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951). That is, a firm that has achieved dominance of a market might find its control sufficient to preserve and even extend its market share by excluding or preventing competition. A variety of techniques may be employed to achieve this end—predatory pricing, lease-only policies, and exclusive buying arrangements, to list a few.

Even if the origin of the monopoly power was innocent, therefore, the *Grinnell* rule recognizes that maintaining or extending market control by the exercise of that power is sufficient to complete a violation of § 2. As we have explained, only considerations of fairness and the need to preserve proper economic incentives prevent the condemnation of § 2 from extending even to one who has gained his power by purely competitive means. The district court judge correctly indicated that such a monopolist is tolerated but not cherished. Thus, the rule of *Grinnell* must be read together with the teaching of *Griffith,* that the mere existence of monopoly power "whether lawfully or unlawfully acquired," is in itself violative of § 2, "provided it is coupled with the purpose or intent to exercise that power." 334 U.S. at 107, 68 S.Ct. at 945.

The key to analysis, it must be stressed, is the concept of market power. Although power may be derived from size, *e. g., United States v. Swift & Co.,* 286 U.S. 106, 116, 52 S.Ct. 460, 76 L.Ed. 999 (1932), the two are not identical. F. Scherer, *supra,* at 352. A firm that has lawfully acquired a monopoly position is not barred from taking advantage of scale economies by constructing, for example, a large and efficient factory. These benefits are a consequence of size and not an exercise of power over the market.[12] Nevertheless, many anticompetitive

---

12. Nor is a lawful monopolist ordinarily precluded from charging as high a price for its

product as the market will accept. True, this is a use of economic power; indeed, the differen-

actions are possible or effective only if taken by a firm that dominates its smaller rivals. *See Telex Corp. v. International Business Machines Corp.,* 510 F.2d 894, 925–26 (10th Cir.), *cert. dismissed,* 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975). A classic illustration is an insistence that those who wish to secure a firm's services cease dealing with its competitors. *See, e. g., Lorain Journal Co., supra.* Such conduct is illegal when taken by a monopolist because it tends to destroy competition, although in the hands of a smaller market participant it might be considered harmless, or even "honestly industrial." *Alcoa, supra,* 148 F.2d at 431.

In sum, although the principles announced by the § 2 cases often appear to conflict, this much is clear. The mere possession of monopoly power does not *ipso facto* condemn a market participant. But, to avoid the proscriptions of § 2, the firm must refrain at all times from conduct directed at smothering competition. This doctrine has two branches. Unlawfully acquired power remains anathema even when kept dormant. And it is no less true that a firm with a legitimately achieved monopoly may not wield the resulting power to tighten its hold on the market.

### C. *Monopoly Power as a Lever in Other Markets*

■ It is clear that a firm may not employ its market position as a lever to create—or attempt to create—a monopoly in another market. *See, e. g., Griffith, supra; Smith-Kline Corp. v. Eli Lilly & Co.,* 575 F.2d 1056 (3d Cir.), *cert. denied,* 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978). Kodak, in the period relevant to this suit, was never close to gaining control of the markets for photofinishing equipment or services and could not be held to have attempted to monopolize them.[13] Berkey nevertheless contends that Kodak illicitly

gained an advantage in these areas by leveraging its power over film and cameras. Accordingly, we must determine whether a firm violates § 2 by using its monopoly power in one market to gain a competitive advantage in another, albeit without an attempt to monopolize the second market. We hold, as did the lower court, that it does.

This conclusion appears to be an inexorable interpretation of the antitrust laws. We tolerate the existence of monopoly power, we repeat, only insofar as necessary to preserve competitive incentives and to be fair to the firm that has attained its position innocently. There is no reason to allow the exercise of such power to the detriment of competition, in either the controlled market or any other. That the competition in the leveraged market may not be destroyed but merely distorted does not make it more palatable. Social and economic effects of an extension of monopoly power militate against such conduct.

The *Griffith* case confirms this view. There, a chain of motion picture exhibitors operated the only theaters in a number of towns, and used its concomitant buying power to extract from distributors certain exclusive rights in other localities where it faced challengers. The Court held that monopoly power had been illegally used "to beget monopoly," 334 U.S. at 108, 68 S.Ct. 941. Its rationale swept more broadly, however, for it admonished that "the use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor, is unlawful." *Id.* at 107, 68 S.Ct. at 945.

This rule is linked to the prohibition against tying arrangements in the sale of goods and services. *See* 3 P. Areeda & D. Turner, *supra,* at 223–24. Indeed, in *Northern Pacific Railway v. United States,* 356 U.S. 1, 11, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958),

---

tial between price and marginal cost is used as an indication of the degree of monopoly power, 2 P. Areeda & D. Turner, *supra,* at 323–24; *see Borden, Inc.,* 3 Trade Reg. Rep. (CCH) ¶ 21,490, at 21,502–03 (FTC 1978). But high prices, far from damaging competition, invite new competitors into the monopolized market. *See*

Part IV *infra.* Excessive prices may, however, create an illegal "price squeeze" in another market. *See Alcoa, supra,* 148 F.2d at 438.

**13.** The jury rejected this contention, which was submitted to them *dubitante.*

the Supreme Court described the "vice" of ties in language evocative of *Griffith:* "the use of economic power in one market to restrict competition on the merits in another." And to condemn a tie, the market for the tied product need not be monopolized. It suffices that a "substantial" amount of competition is foreclosed. *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 608–09, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); *International Salt Co. v. United States,* 332 U.S. 392, 396, 68 S.Ct. 12, 92 L.Ed. 20 (1947).

We need not rely solely on policy considerations or an analysis of the *Griffith dictum* to support the view asserted here. Indeed, whatever problems of murkiness may plague the *Alcoa* opinion, on this point it is pellucid. The defendant had employed its monopoly power in the ingot market to impose a price squeeze on the manufacturers of aluminum sheet.[14] Although this court expressly noted that there was no attempt to monopolize the sheet market, it held the challenged practice to be "an unlawful exercise of 'Alcoa's' power." 148 F.2d at 438. A more recent case arriving at the same conclusion is *Sargent-Welch Scientific Co. v. Ventron Corp.,* 567 F.2d 701, 711–13 (7th Cir.), *cert. denied,* 439 U.S. 822, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978). There a manufacturer of precision scientific instruments with a monopoly in the market for electromagnetic microbalances allegedly threatened to refuse to sell these devices to retailers who did not stock its millibalances as well. The court ruled that this practice would violate § 2, even though Ventron did not seek or gain a monopoly in the market for millibalances.[15]

▪ Accordingly, the use of monopoly power attained in one market to gain a competitive advantage in another is a violation of § 2, even if there has not been an attempt to monopolize the second market. It is the use of economic power that creates the liability. But, as we have indicated, a large firm does not violate § 2 simply by reaping the competitive rewards attributable to its efficient size, nor does an integrated business offend the Sherman Act whenever one of its departments benefits from association with a division possessing a monopoly in its own market. So long as we allow a firm to compete in several fields, we must expect it to seek the competitive advantages of its broad-based activity— more efficient production, greater ability to develop complementary products, reduced transaction costs, and so forth. These are gains that accrue to any integrated firm, regardless of its market share, and they cannot by themselves be considered uses of monopoly power.

We shall now apply to the case at bar the principles we have set forth above.

### III. THE 110 SYSTEM

We turn now to the events surrounding Kodak's introduction of the 110 photographic system in 1972. In many respects, the factors present here are representative of the case as a whole. They involve four of the five principal markets and provide the basis for several of the damages verdicts upheld by the district court, including the largest, an award of $15,250,000, before trebling, for lost camera sales.

We commented earlier on the camera revolution sparked by Kodak's introduction of the 126 Instamatic in 1963. Ben Berkey, chairman of Berkey Photo, described the camera's cartridge-loading feature as "foolproof" and remarked that the new simple system gave the industry "a great boost." Even before the 126 was introduced, however, Kodak had set its sights on a new, smaller line of Instamatic cameras. The

---

14. That is, Alcoa sold ingot to rival sheetmakers at such a high price that it gained a distinct competitive advantage for its own sales of sheet.

15. We cannot accept Kodak's argument that, read literally, § 2 prevents a plaintiff from recovering unless there was at least an attempt to monopolize the market in which it claims to have been injured. Since monopoly power itself is the target of § 2, it is unreasonable to suggest that a firm that possesses such power in one market and uses it to damage competition in another does not "monopolize" within the meaning of the statute.

aim of Kodak's Project 30, or P–30, as it was often called, was a camera barely one inch thick but capable of producing photographs as clear and large as its bulkier cousins.

Kodak's desire to produce large, high-quality snapshots from a small camera created successive ripples in a number of ponds. As camera size decreases, so does the area of film exposed when the shutter is opened. Thus the negative must be substantially enlarged to produce a print, and the P–30 group was concerned that the Kodak color print film then in use, Kodacolor X, might not be equal to the task. There was fear that it was too "grainy"— that full-size photographs printed from tiny Kodacolor X negatives would have an unacceptably speckled, pebbly appearance, reflecting the extreme magnification of the small light-sensitive grains constituting the film.

The early view at P–30 had been that despite this problem Kodacolor X would prove "quite adequate" for the new format. By 1966, however, the Kodacolor Future System Committee, considering Kodak's film sales in the 126 size as well as in the format being created by Project 30, began actively to consider the possibility of developing a new type of Kodacolor film. This engendered the second set of ripples, for the committee realized that basic changes in the film would require a new photofinishing process, conducted at temperatures higher than those used in the so-called C–22 method by which prints were made from Kodacolor X. Some committee members, therefore, expressed concern about the effect that a new process might have on independent photofinishers, who developed Kodak film and were purchasers of Kodak equipment and supplies. These concerns

were shared by a number of Kodak scientists, such as D. M. Zwick, who feared an "unethical" attempt to create a "deliberate . . . incompatibility with systems other than Kodacolor." [16]

Nevertheless, on May 10, 1967, the committee recommended that Kodak proceed with the development of the new film and finishing process, tentatively labeled P–118. This recommendation was adopted at a meeting of the Kodak management on September 20. Although management believed that many of the film improvements were desirable "without regard to the P–30 program," it decided that Kodak should consider marketing the new film in the P–30 size for approximately one year before introducing it in the 126 format. A firm date was not set at that time for introduction of P–118, but by 1969 Kodak decided that P–118 should be used to help launch the P–30 camera system in March 1972. This decision appears to have been influenced by the views of those Kodak officers who believed that

> [w]ithout a new film, the [camera] program is not a new advertisable system. Without the film, our splicer and processors [for the new high-temperature photofinishing process] are not required.

To meet this self-imposed deadline for P–118, Kodak was required to act in great haste. Indeed, the minutes of a Film Process Subcommittee meeting of August 29, 1969, noted that the decision for a 1972 release date required a "crash program" by all participating divisions. Development schedules were altered and some tests eliminated altogether. Not surprisingly, then, as the target date approached, Kodak realized that its new film was plagued by a number of difficulties.

16. Writing on March 9, 1967, Zwick saw "no need" for a new film, which would require a higher-temperature process: "We can make *small* improvements in Kodacolor X grain and sharpness, in a film which could go through the C–22 process." On the same day, another Kodak scientist, N. H. Groet of the Color Photography Division, wrote that he was "convinced that Project 30 could go with the presently available Kodacolor X · film." Like Zwick,

Groet conceded that a finer-grained film "would be most welcome for P–30," but he did not believe that major changes in Kodacolor X would be necessary. Indeed, he believed that the new finishing process being considered by the Kodacolor Future System Committee

> would raise hell in the photofinishing business, would do little to decrease the cost of the operation, and that the ultimate customer would not benefit.

Shortly after initial production runs began in October 1971, Kodak recognized that "several product deficiencies" would exist in the film, now called Kodacolor II, at the time of introduction. Indeed, just eight days before the joint announcement of the new camera, film, and photofinishing process, a technical committee listed eleven "presently identified" problems that could affect "the customer's ultimate quality." Not only did Kodacolor II have a significantly shorter shelf life than had been anticipated, but it also proved grainier than Kodak had originally hoped. This problem was highly significant, of course, because low graininess was supposedly the quality that made Kodacolor II especially suitable for the Pocket Instamatic cameras.[17]

Despite these deficiencies, Kodak proceeded with its plans for introduction of the 110 system, of which Kodacolor II had become an integral part. On March 16, 1972, amid great fanfare, the system was announced. Finally, said Kodak, there was a "little camera that takes big pictures." Kodacolor II was "a remarkable new film"—indeed, the best color negative film Kodak had ever manufactured. There had long been other small cameras, Kodak explained:

> But they weren't like these. Now there are films fine enough, and sharp enough, to give you big, sharp pictures from a very small negative.

In accord with Kodak's 1967 plan, Kodacolor II was sold only in the 110 format for eighteen months after introduction. It remains the only 110-size color print film Kodak has ever sold.[18]

As Kodak had hoped, the 110 system proved to be a dramatic success. In 1972—the system's first year—the company sold 2,984,000 Pocket Instamatics, more than 50% of its sales in the amateur conventional still camera market. The new camera thus accounted in large part for a sharp increase in total market sales, from 6.2 million units in 1971 to 8.2 million in 1972. Rival manufacturers hastened to market their own 110 cameras, but Kodak stood alone until Argus made its first shipment of the "Carefree 110" around Christmas 1972. The next year, although Kodak's competitors sold over 800,000 110 cameras, Kodak retained a firm lead with 5.1 million. Its share of 110 sales did not fall below 50% until 1976. Meanwhile, by 1973 the 110 had taken over most of the amateur market from the 126, and three years later it accounted for nearly four-fifths of all sales.

Berkey's Keystone division was a late entrant in the 110 sweepstakes, joining the competition only in late 1973. Moreover, because of hasty design, the original models suffered from latent defects, and sales that year were a paltry 42,000. With interest in the 126 dwindling, Keystone thus suffered a net decline of 118,000 unit sales in 1973. The following year, however, it recovered strongly, in large part because improvements in its pocket cameras helped it sell 406,000 units, 7% of all 110s sold that year.

Berkey contends that the introduction of the 110 system was both an attempt to monopolize and actual monopolization of the camera market. It also alleges that the marketing of the new camera constituted an impermissible leveraging of Kodak's film monopoly into the two photofinishing markets, services and equipment.[19]

■ Because the jury returned what amounted to general verdicts for the plaintiff on each of these charges, we are bound in the following discussion to construe the

---

17. Kodacolor II's grain, though disappointing, was clearly superior to that of Kodacolor X. Berkey does not appear to dispute the point. Shortly after introduction of the 110 system, a confidential memorandum prepared by a competitor in the film market compared Kodacolor II with Kodacolor X and found that the new film "yields a less granular image structure and, therefore, better detail rendition in an enlarged color print."

18. Three pre-existing Kodak films were, however, sold for other uses: Verichrome Pan for black-and-white snapshots, and Kodachrome X and Ektachrome X for color slides.

19. The jury found Kodak guilty of leveraging its monopoly power into the market for photofinishing chemicals, see note 1, supra. Berkey withdrew this claim during the damages trial, citing its inability to obtain statistical proof of its own harm.

evidence and the possible inferences in the light most favorable to Berkey. *See, e. g., Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 696 & n.6, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). We note *en passant,* however, that in large and complex cases such as this, involving many novel legal issues, the better practice would have been to require special verdicts or the submission of interrogatories to the jury pursuant to Fed.R.Civ.P. 49. In that way the right to a jury trial of all factual issues is preserved[20] while the probability of a laborious and expensive retrial is reduced. *See SCM Corp. v. Xerox Corp.,* 463 F.Supp. 983, 988–90 & nn.13, 15 (D.Conn.1978), *remanded on other grounds,* 599 F.2d 32 (2d Cir. 1979). Certainly the already difficult task of reviewing a case of this magnitude would have been eased somewhat for this court if we knew precisely what the jury's findings were on several specific factual issues.

A. *Attempt to Monopolize and Monopolization of the Camera Market*

There is little doubt that the evidence supports the jury's implicit finding that Kodak had monopoly power in cameras.[21] The principal issues presented to us regarding the effect of the 110 introduction in the camera market are whether Kodak engaged in anticompetitive conduct and, if so, whether that conduct caused injury to Berkey.

It will be useful at the outset to present the arguments on which Berkey asks us to uphold its verdict:

(1) Kodak, a film and camera monopolist, was in a position to set industry standards. Rivals could not compete effectively without offering products similar to Kodak's. Moreover, Kodak persistently refused to make film available for most formats other than those in which it made cameras. Since cameras are worthless without film, this policy effectively prevented other manufac-

turers from introducing cameras in new formats. Because of its dominant position astride two markets, and by use of its film monopoly to distort the camera market, Kodak forfeited its own right to reap profits from such innovations without providing its rivals with sufficient advance information to enable them to enter the market with copies of the new product on the day of Kodak's introduction. This is one of several "predisclosure" arguments Berkey has advanced in the course of this litigation.

(2) The simultaneous introduction of the 110 camera and Kodacolor II film, together with a campaign advertising the two jointly, enabled Kodak to garner more camera sales than if it had merely scaled down Kodacolor X to fit the new camera. The jury could conclude that Kodacolor II was an inferior product and not technologically necessary for the success of the 110. In any event, Kodak's film monopoly prevented any other camera manufacturer from marketing such a film-camera "system" and the joint introduction was therefore anticompetitive.

(3) For eighteen months after its introduction, Kodacolor II was available only in the 110 format. Thus it followed that any consumer wishing to use Kodak's "remarkable new film" had to buy a 110 camera. Since Kodak was the leading—and at first the only—manufacturer of such devices, its camera sales were boosted at the expense of its competitors.

For the reasons explained below, we do not believe any of these contentions is sufficient on the facts of this case to justify an award of damages to Berkey. We therefore reverse this portion of the judgment.

1. *Predisclosure*

Through the 1960s, Kodak followed a checkered pattern of predisclosing innovations to various segments of the industry. Its purpose on these occasions evidently was to ensure that the industry would be able to

---

**20.** Since the issue is not presented on this appeal, we need not express our view on whether some actions may be too complex to be tried to a jury. The relevant cases are canvassed in

Note, *The Right to a Jury Trial in Complex Civil Litigation,* 92 Harv.L.Rev. 898 (1979).

**21.** *See* note 11 *supra.*

meet consumers' demand for the complementary goods and services they would need to enjoy the new Kodak products. But predisclosure would quite obviously also diminish Kodak's share of the auxiliary markets. It was therefore, in the words of Walter Fallon, Kodak's chief executive officer, "a matter of judgment on each and every occasion" whether predisclosure would be for or against Kodak's self-interest. Thus, well before the 1965 introduction of Super-8 movie films, Kodak, which had a relatively small share of the movie camera market, provided sufficient information to companies such as Keystone and Bell & Howell to enable them to make cameras to use the new film. It also released processing information so that photofinishers could develop the film. But in 1963, when Kodak came out with Kodacolor X and the 126 Instamatic, it kept its own counsel until the date of introduction.

As early as 1968, some Kodak employees urged that advance warning of the P–30 system would be needed, at least to film processors and manufacturers of photofinishing equipment, to give them time to prepare for Kodacolor II and the new high-temperature finishing process, which was eventually labeled C–41. One memorandum noted that "P–30 will require more changes in photofinishing techniques than were required for P–13 [the 126 system]. These differences . . . seem to indicate a minimum 6 month advance disclosure to other firms." [22] Nevertheless, Kodak decided not to release advance information about the new film and format. The decision was evidently based on the perception of Dr. Louis K. Eilers, Kodak's chief executive officer at that time, that Kodak would gain more from being first on the market for the sale of all goods and services related to the 110 system than it would lose from the inability of other photofinishers to process Kodacolor II. An important factor in Eilers's thinking may have been that Kodak had already decided to manufacture the new film initially in the 110 format only.

Since Kodacolor II could not be used in any pre-existing cameras, the demand for photofinishing services and equipment in the first several months would be within the capacities of CP&P and KAD.

Although Kodak had most seriously considered divulging advance information of the 110 system to processors and equipment manufacturers, it was a rival camera maker that forced a small breach in its wall of secrecy. In the summer of 1971, Bell & Howell, implicitly threatening legal action, began to pressure Kodak "to notify photographic equipment manufacturers in advance of its introduction of new films or film formats which require changes in equipment design." Harmer Brereton, Kodak's general counsel, insisted in letters to Bell & Howell that such predisclosure was not necessary and would raise legal problems of its own. Nevertheless, afraid that the two companies "were getting ready to get into the ring," Kodak determined to avoid litigation if it could, and it proposed an experimental predisclosure arrangement with the 110 system. On January 3, 1972, Brereton informed Bell & Howell that Kodak would soon introduce "a new cartridge-loading still camera and [slide] projector to accommodate a new film format." More information, Brereton explained, would be forthcoming only for a fee, necessary to compensate Kodak for its "very considerable research and development expenses" and to represent the value of such knowledge to the recipient.

Brereton's letter made clear that the information would be available to other camera makers "on a nondiscriminatory basis," and within the next two weeks Kodak explained the offer to Berkey. For a fee of $10,000 Kodak would provide a general description of the new film format and cartridge, a view of the cartridge and sample prints and slides, the anticipated dates of announcement and commercial introduction, and an outline of the terms on which Kodak would further disclose "such infor-

---

22. The same memorandum also recommended six-month predisclosure to competing film manufacturers.

mation as we believe will enable you to design and manufacture cameras to accept our new cartridge and film format." Berkey paid the $10,000 fee and also the supplemental fees, totalling $50,000 for eleven sheets of specifications and notes. For the $60,000 Berkey gained somewhat less than two months advance knowledge of information it needed to compete with Kodak in the sale of 110 cameras. The jury could unquestionably conclude that this was far from adequate to permit Berkey to be "at the starting line" when the 110 was introduced.

■ Judge Frankel did not decide that Kodak should have disclosed the details of the 110 to other camera manufacturers prior to introduction. Instead, he left the matter to the jury, instructing them as follows:

> Standing alone, the fact that Kodak did not give advance warning of its new products to competitors would not entitle you to find that this conduct was exclusionary. Ordinarily a manufacturer has no duty to predispose its new products in this fashion. It is an ordinary and acceptable business practice to keep one's new developments a secret. However, if you find that Kodak had monopoly power in cameras or in film, and if you find that this power was so great as to make it impossible for a competitor to compete with Kodak in the camera market unless it could offer products similar to Kodak's, you may decide whether in the light of other conduct you determine to be anticompetitive, Kodak's failure to predisclose was on balance an exclusionary course of conduct.

We hold that this instruction was error and that, as a matter of law, Kodak did not have a duty to predisclose information about the 110 system to competing camera manufacturers.

As Judge Frankel indicated, and as Berkey concedes, a firm may normally keep its innovations secret from its rivals as long as it wishes, forcing them to catch up on the strength of their own efforts after the new product is introduced. *See, e. g., Kewanee*

*Oil Co. v. Bicron Corp.*, 416 U.S. 470, 481, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974). It is the possibility of success in the marketplace, attributable to superior performance, that provides the incentives on which the proper functioning of our competitive economy rests. If a firm that has engaged in the risks and expenses of research and development were required in all circumstances to share with its rivals the benefits of those endeavors, this incentive would very likely be vitiated.

■ Withholding from others advance knowledge of one's new products, therefore, ordinarily constitutes valid competitive conduct. Because, as we have already indicated, a monopolist is permitted, and indeed encouraged, by § 2 to compete aggressively on the merits, any success that it may achieve through "the process of invention and innovation" is clearly tolerated by the antitrust laws. *United Shoe Machinery Corp., supra,* 110 F.Supp. at 344.

The Supreme Court's language in *United States v. National Lead Co.*, 332 U.S. 319, 67 S.Ct. 1634, 91 L.Ed. 2077 (1947), is instructive on this score. There, National Lead and du Pont were found to have engaged in an illegal patent pool that restrained commerce in titanium products. As part of its decree, the district court ordered the firms to make licenses available at reasonable fees and also to make available—for a period of three years and at a reasonable fee—certain information on processes exploiting these patents. The Supreme Court upheld these requirements as a reasonable remedy for the antitrust violations. *Id.* at 334–35, 67 S.Ct. 1634. It squarely rejected, however, the Government's attempt to extend the decree by requiring the defendants to furnish—again for only three years and at a reasonable fee—all information desired by any applicant relating to the methods and processes for manufacturing titanium pigments:

> The attempt of the Government to throw the field of technical knowledge in the titanium pigment industry wide-open would reduce the competitive value of the independent research of the parties. It

would discourage rather than encourage competitive research. *Id.* at 359, 67 S.Ct. at 1653.

Moreover, enforced predisclosure would cause undesirable consequences beyond merely encouraging the sluggishness the Sherman Act was designed to prevent. A significant vice of the theory propounded by Berkey lies in the uncertainty of its application. Berkey does not contend, in the colorful phrase of Judge Frankel, that "Kodak has to live in a goldfish bowl," disclosing every innovation to the world at large.[23] However predictable in its application, such an extreme rule would be insupportable. Rather, Berkey postulates that Kodak had a duty to disclose limited types of information to certain competitors under specific circumstances. But it is difficult to comprehend how a major corporation, accustomed though it is to making business decisions with antitrust considerations in mind, could possess the omniscience to anticipate all the instances in which a jury might one day in the future retrospectively conclude that predisclosure was warranted.[24] And it is equally difficult to discern workable guidelines that a court might set forth to aid the firm's decision. For example, how detailed must the information conveyed be? And how far must research have progressed before it is "ripe" for disclosure? These inherent uncertainties would have an inevitable chilling effect on innovation. They go far, we believe, towards explaining why no court has ever imposed the duty Berkey seeks to create here.

An antitrust plaintiff urging a predisclosure rule, therefore, bears a heavy burden in justifying his request. Berkey recognizes the weight of this burden. It contends that it has been met. Kodak is not a monolithic monopolist, acting in a single market. Rather, its camera monopoly was supported by its activity as a film manufacturer. Berkey therefore argues that by not disclosing the new format in which it was manufacturing film, Kodak unlawfully enhanced its power in the camera market. Indeed, Kodak not only participates in but monopolizes the film industry. The jury could easily have found that, when Kodak introduced a new film format, rival camera makers would be foreclosed from a substantial segment of the market until they were able to manufacture cameras in the new format. Accordingly, Berkey contended that Kodak illegitimately used its monopoly power in film to gain a competitive advantage in cameras. Thus Berkey insists that the jury was properly permitted to consider whether, on balance, the failure to predisclose the new format was exclusionary. We disagree.

We note that this aspect of Berkey's claim is in large measure independent of the fact that a new film, Kodacolor II, was introduced simultaneously with the new format. It is primarily introduction of the format itself—the size of the film and the cartridge in which it is packaged—of which Berkey complains. Indeed, at oral argument counsel for Berkey contended that predisclosure would have been required even had Kodak merely cut down Kodacolor X to fit the new 110 camera and cartridge.

We do not perceive, however, how Kodak's introduction of a new format was rendered an unlawful act of monopolization in the camera market because the firm also manufactured film to fit the cameras. The 110 system was in substantial part a camera development. After all, P–30 existed long before the P–118 film project began, and much of the creative energy behind it was consumed by efforts to produce the camera itself.[25] Indeed, Berkey not only argues

---

**23.** This is apparent from the transcript of the conference to settle the language of the charge to the jury.

**24.** Berkey's argument that Kodak considered predisclosing the 110 system, and so could not be surprised when found liable for failing to do so, is thus a two-edged sword. It illustrates the

difficulties in prediction even when the problem has been squarely faced.

**25.** The "red-eye" problem experienced by the early 110 models, *see* note 35 *infra*, does not detract from the fact that the new camera was indeed smaller and more convenient than its predecessors.

that a new film was not necessary to introduce the new pocket cameras; it also concedes that the early models of its own 110 cameras, brought to market some eighteen months after it first learned of the new format, suffered because of the haste with which they were designed.

Clearly, then, the policy considerations militating against predisclosure requirements for monolithic monopolists are equally applicable here. The first firm, even a monopolist, to design a new camera format has a right to the lead time that follows from its success. The mere fact that Kodak manufactured film in the new format as well, so that its customers would not be offered worthless cameras, could not deprive it of that reward. Nor is this conclusion altered because Kodak not only participated in but dominated the film market. Kodak's ability to pioneer formats does not depend on it possessing a film monopoly. Had the firm possessed a much smaller share of the film market, it would nevertheless have been able to manufacture sufficient quantities of 110-size film—either Kodacolor X or Kodacolor II—to bring the new camera to market. It is apparent, therefore, that the ability to introduce the new format without predisclosure was solely a benefit of integration and not, without more, a use of Kodak's power in the film market to gain a competitive advantage in cameras.

Indeed, such authority as exists supports this conclusion. *ILC Peripherals Leasing Corp. v. International Business Machines Corp.*, 458 F.Supp. 423 (N.D.Cal.1978) (*Memorex*), was a case similar in some respects to this one. IBM was the leading manufacturer of central data processing units (CPUs) and competed with Memorex and others to supply peripheral equipment for use in conjunction with IBM CPUs. When IBM made changes in the intricate interface—the "computer 'plug' "—by which peripherals are attached to the central system, it did not provide advance information to Memorex, thereby forcing its rival to learn what it could after the new CPUs were shipped to customers. Memorex contended that to compete effectively in the peripher-

als market it needed to know, under some form of licensing arrangement, about interface changes as soon as IBM announced its products. *Id.* at 436–37. Noting the total absence of authority in support of this position, the district court indicated that plaintiff could properly be left to rely on "reverse engineering" to develop IBM-compatible equipment. IBM would thus be unchallenged for a time in the market for certain peripherals, but "[d]epriving IBM of its lead time would remove its incentive to invent." *Id.* at 437.

The predisclosure demanded here is much more radical than that sought and rejected in *Memorex*. Berkey claims that it should have been given the information about Kodak's new film format long before product announcement and without any licensing fee. Moreover, the possibility lurking in *Memorex* that IBM, by creating technological incompatibilities, was tying peripherals sales to its CPUs is not present here. *Cf. Response of Carolina, Inc. v. Leasco Response, Inc.*, 537 F.2d 1307, 1330 (5th Cir. 1976). Kodak's new format was primarily a camera development, and the use of Kodacolor II did not in itself create any incompatibilities with an existing camera. Regardless of whether the district court decided *Memorex* correctly—a question we are pleased to leave to our colleagues in the Ninth Circuit—the case makes it manifest that there is no authority for the extreme position asserted by Berkey.

Our analysis, however, must proceed beyond the conclusion that introduction of film to meet Kodak's new camera format was not in itself an exercise of the company's monopoly power in film. Berkey contends that Kodak in the past used its film monopoly to stifle format innovations by any other camera manufacturer. Accordingly, it argues that Kodak was barred from reaping the benefits of such developments without making predisclosure to allow its rivals to share from the beginning in the rewards.

There is, indeed, little doubt that the jury could have found that Kodak, by refusing

to make film available on economical terms, obstructed sales of cameras in competing formats. Thus, Kodak has never supplied film to fit the Minox, a small camera[26] that uses a cartridge similar to that of the Instamatics and that has been on the market since the 1930s, or similar cameras by Minolta and Mamiya that were also introduced before the Kodak 126. Merchants of these cameras, including Berkey, made numerous requests that Kodak sell film packaged in their formats, with or without the Kodak name. As an alternative, they asked Kodak to sell bulk film rolls large enough to permit the camera manufacturers economically to cut the film down to the appropriate size and spool it. Kodak denied all such appeals. Some of the miniature cameras did survive but, as even Kodak's own economic expert testified, its policy drastically reduced the ability of rival manufacturers to compete by introducing new camera formats.[27]

■ We accept the proposition that it is improper, in the absence of a valid business policy, for a firm with monopoly power in one market to gain a competitive advantage in another by refusing to sell a rival the monopolized goods or services he needs to compete effectively in the second market. Indeed, Kodak itself was the defendant in the leading case establishing this point. *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 375, 47 S.Ct. 400, 71 L.Ed. 684 (1927); *accord, Poster Exchange, Inc. v. National Screen Service*

*Corp.*, 431 F.2d 334, 339–40 (5th Cir. 1970), *cert. denied*, 401 U.S. 912, 91 S.Ct. 880, 27 L.Ed.2d 811 (1971). Moreover, as indicated by our discussion of § 2 principles, such a use of power would be illegal regardless of whether the film monopoly were legally or illegally acquired. It may be that Kodak violated the Sherman Act when it refused to sell Berkey bulk film for use in the Minolta camera, and Berkey might well have recovered for its loss of Minolta sales and for any additional expenses incurred because of Kodak's conduct.

■ But Berkey did not sue Kodak then for its refusal to sell film, and it concedes that it is not now claiming a right to damages on this basis. Rather, it contends that Kodak's past offenses created a continuing duty to disclose its new formats to competing camera manufacturers, and that its violation of that obligation supports the jury's verdict. For two reasons, however, we decline to recognize such a duty.

First, the benefits that would flow to Kodak's rivals in the camera market from such a rule bear no relationship to the injury caused them by the monopolist's refusal to sell films for their competing camera formats. There is no reason to suppose, for example, that the loss suffered by Berkey because Kodak undercut Minolta sales was at all comparable to the boon Berkey would have received had Kodak given it the opportunity to participate from the beginning in the 110 revolution.[28] Indeed, some of the

26. The Minox "spy camera" was even smaller, but substantially more expensive, than the 110.

27. Although Kodak does not manufacture cameras in the 135 format, it does sell film for them. This policy may represent a perception that the 135 format competes less directly with Kodak's popular cameras than do the Minolta and other miniature models.

28. Even if the format obstructed by Kodak were comparable to the 110, predisclosure would not be a necessary remedy, as the following example demonstrates. Suppose that Berkey, unaware that Kodak is planning to bring forth the 110 camera, asks Kodak to make film available for a new camera it has designed that happens to be identical in all respects to the 110 except that it requires a slightly different film format. Kodak, without

a legitimate competitive reason and solely to prevent Berkey's camera sales, declines to supply the film. Berkey then concludes that marketing of its new camera would be economically unfeasible. Just three months later, without predisclosure to Berkey, Kodak introduces the 110, which is a great commercial success.

At first it might appear that in this extreme hypothetical case Berkey has a right to share the initial profits of the 110 camera through predisclosure. On closer examination, it becomes clear that the wrong to Berkey is not the absence of knowledge of the 110 but exclusion from the market of its own essentially identical camera. To be sure, most of Kodak's 110 sales would have been captured earlier by Berkey had it not been prevented from introducing its camera, so the volume of Kodak's 110 sales may assist in computation of Berkey's dam-

camera manufacturers who would be benefited by predisclosure might not have participated in—or even contemplated entering—the market at the time Kodak committed its alleged violations. For them, predisclosure would be pure windfall.

Second, it would be inappropriate to hold that Kodak should spontaneously have recognized a duty to release advance information of its new products to its competitors. It is important to note that Berkey, which no longer sells cameras, does not advance its predisclosure argument as part of a demand for equitable relief. Where a firm has engaged in monopolistic practices, a court is not limited, in fashioning prospective remedies, to an injunction against future violations of law. *See, e. g., Schine Chain Theatres, Inc. v. United States*, 334 U.S. 110, 128, 68 S.Ct. 947, 92 L.Ed. 1245 (1948). Hence the function of the court includes "undoing" what the monopoly achieved by its illegal acts. *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 171, 68 S.Ct. 915, 92 L.Ed. 1260 (1948).

■ Accordingly, if Berkey were still a camera maker, it might be able to demand that Kodak, to nullify the effect of its monopolistic obstruction of new formats for competing cameras, be required to allow its rivals to share from the start in the business created by its own changes in format. Even in the equitable context, *National Lead* would caution against a decree that might stifle future innovations. But Berkey, in any event, does not demand prospective relief. Instead it asks us to condemn Kodak retrospectively, holding that it violated § 2 and so is liable for damages, because it did not decide on its own initiative to take unusual, self-abnegatory actions as a corrective for unadjudicated prior offenses. This is without justification.

ages. That, however, is the only relevance of the 110 system to this hypothetical case. As the premise is varied to bring the hypothetical closer to the actual case at bar—for example, by attenuating the physical similarity between the two cameras or the proximity of their arrival in the market—even this relevance disappears. Kodak's violation is completed when it blocks Berkey's new camera format; nothing is added to the offense by its decision to introduce its own new format without predisclosure.

*Conclusion.* We have held that Kodak did not have an obligation, merely because it introduced film and camera in a new format, to make any predisclosure to its camera-making competitors. Nor did the earlier use of its film monopoly to foreclose format innovation by those competitors create of its own force such a duty where none had existed before. In awarding Berkey $15,250,000, just $828,000 short of the maximum amount demanded, the jury clearly based its calculation of lost camera profits on Berkey's central argument that it had a right to be "at the starting line when the whistle blew" for the new system.[29] The verdict, therefore, cannot stand.

### 2. Systems Selling

Berkey's claims regarding the introduction of the 110 camera are not limited to its asserted right to predisclosure. The Pocket Instamatic not only initiated a new camera format, it was also promoted together with a new film. As we noted earlier, the view was expressed at Kodak that "[w]ithout a new film, the [camera] program is not a new advertisable system." Responding in large measure to this perception, Kodak hastened research and development of Kodacolor II so that it could be brought to market at the same time as the 110 system. Based on such evidence, and the earlier joint introduction of Kodacolor X and the 126 camera, the jury could readily have found that the simultaneous release of Kodacolor II and the Pocket Instamatic was part of a plan by which Kodak sought to use its combined film and camera capabilities to bolster faltering camera sales. Berkey contends that this program of selling was anticompetitive and therefore violated § 2. We disagree.

**29.** The three 110 damages theories, submitted to the jury in the alternative, attempted to measure the displacement of Berkey camera sales from the moment the 110 system was introduced. One theory, allocating to Berkey its "fair share" of all Kodak post-introduction camera sales, indicated untrebled damages of $16,073,000. The other two theories, addressing 110 sales only, suggested $13,668,000 and $15,835,000 respectively.

It is important to identify the precise harm Berkey claims to have suffered from this conduct. It cannot complain of a product introduction *simpliciter* for the same reason it could not demand predisclosure of the new format: any firm, even a monopolist, may generally bring its products to market whenever and however it chooses.[30] Rather, Berkey's argument is more subtle. It claims that by marketing the Pocket Instamatics in a system with a widely advertised new film, Kodak gained camera sales at Berkey's expense. And, because Kodacolor II was not necessary to produce satisfactory 110 photographs and in fact suffered from several deficiencies, these gains were unlawful.[31]

It may be conceded that, by advertising Kodacolor II as a "remarkable new film" capable of yielding "big, sharp pictures from a very small negative," Kodak sold more 110 cameras than it would have done had it merely marketed Kodacolor X in 110-size cartridges. The quality of the end product—a developed snapshot—is at least as dependent upon the characteristics of the film as upon those of the camera. It is perfectly plausible that some customers bought the Kodak 110 camera who would have purchased a competitor's camera in another format had Kodacolor II not been available and widely advertised as capable of producing "big, sharp pictures" from the tiny Pocket Instamatic. Moreover, there was also sufficient evidence for the jury to conclude that a new film was not necessary to bring the new cameras to market. Walter Fallon testified that in 1967, as manager of Kodak's Film Emulsion and Plate Organ-

ization, he expressed the view that Kodacolor X "would give satisfactory pictures, satisfactory customer results" in the P–30 format. Documents introduced at trial indicated that this opinion was shared by at least two Kodak research scientists.[32]

But necessity is a slippery concept. Indeed, the two scientists, Zwick and Groet, conceded that improvements in the quality of Kodacolor X would be "most welcome." Even if the 110 camera would produce adequate snapshots with Kodacolor X, it would be difficult to fault Kodak for attempting to design a film that could provide better results. The attempt to develop superior products is, as we have explained, an essential element of lawful competition. Kodak could not have violated § 2 merely by introducing the 110 camera with an improved film.

Accordingly, much of the evidence at trial concerned the dispute over the relative merits of Kodacolor II and Kodacolor X. There was ample evidence that for some months following the 110 introduction, Kodacolor II was inferior to its predecessor in several respects. Most notably, it degenerated more quickly than Kodacolor X, so that its shelf life was shorter.[33] It is undisputed, however, that the grain of Kodacolor II, though not as fine as Kodak had hoped, was better than that of the older film.[34]

In this context, therefore, the question of product quality has little meaning. A product that commends itself to many users because superior in certain respects may be rendered unsatisfactory to others by flaws they considered fatal. Millions of consumers, for example, evidently found the 110

**30.** This is not to say, of course, that new product introductions are *ipso facto* immune from antitrust scrutiny, and we do not agree with Kodak's argument that they are, *see, e. g., Sargent-Welch Scientific Co. v. Ventron Corp.,* 567 F.2d 701 (7th Cir. 1977), *cert. denied,* 439 U.S. 822, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978) (use of power over old product to promote sale of new); in all such cases, however, it is not the product introduction itself, but some associated conduct, that supplies the violation.

**31.** To the extent that Berkey argues that Kodak's past monopolization of film hindered any other firm from introducing a new photograph-

ic system, the contention is merely a repetition of that rejected in Part III.A.1 *supra.*

**32.** *See* note 16 *supra.*

**33.** Testimony and documents introduced at trial indicated that Kodacolor II lost much of its "speed", *see* note 8, *supra,* within three to six months of manufacture. In addition, there were problems with "latent image keeping"—the ability of the film to retain a scene until the film was developed.

**34.** *See* note 17 *supra.*

camera highly attractive because of its "pocketability." Others, perhaps more concerned over the quality of their flash pictures, found the original models unsatisfactory because of the high incidence of "red-eye."[35] Similarly, some individuals would, if given the option and aware of the relevant factors,[36] select Kodacolor II over Kodacolor X because of its superior grain, which was especially useful for a small camera; others might choose Kodacolor X because the original variety of Kodacolor II had to be used more quickly to produce attractive pictures.

It is evident, then, that in such circumstances no one can determine with any reasonable assurance whether one product is "superior" to another. Preference is a matter of individual taste. The only question that can be answered is whether there is sufficient demand for a particular product to make its production worthwhile, and the response, so long as the free choice of consumers is preserved, can only be inferred from the reaction of the market.

When a market is dominated by a monopolist, of course, the ordinary competitive forces of supply may not be fully effective. Even a monopolist, however, must generally be responsive to the demands of customers, for if it persistently markets unappealing goods it will invite a loss of sales and an increase of competi-

tion.[37] If a monopolist's products gain acceptance in the market, therefore, it is of no importance that a judge or jury may later regard them as inferior, so long as that success was not based on any form of coercion. Certainly the mere introduction of Kodacolor II along with the Pocket Instamatics did not coerce camera purchasers.[38] Unless consumers desired to use the 110 camera for its own attractive qualities, they were not compelled to purchase Kodacolor II—especially since Kodak did not remove any other films from the market when it introduced the new one. If the availability of Kodacolor II spurred sales of the 110 camera, it did so because some consumers regarded it as superior, at least for the smaller format.[39]

Of course, Kodak's advertising encouraged the public to take a favorable view of both Kodacolor II and the 110 camera, but that was not improper. A monopolist is not forbidden to publicize its product unless the extent of this activity is so unwarranted by competitive exigencies as to constitute an entry barrier. See *American Tobacco Co. v. United States*, 328 U.S. 781, 797, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); *Borden, Inc.*, 3 Trade Reg. Rep. (CCH) ¶ 21,- 490 (FTC 1978). And in its advertising, a producer is ordinarily permitted, much like an advocate at law, to bathe his cause in the best light possible.[40] Advertising that em-

---

**35.** "Red-eye" is the appearance of a red glint in the eye of the snapshot's subject on a picture taken with a flashlamp. It is a result in large part of the small distance between the flash device and the camera lens. Hence, it was a greater problem for the original 110 cameras than for their larger predecessors in the 126 format.

**36.** *See* note 42 *infra*.

**37.** *See* 3 P. Areeda & D. Turner, *supra*, at 41–42.

**38.** Similarly, it appears that the Pocket Instamatic spurred sales of Kodak's film at the expense of its competitors, despite a red-eye problem that made the camera unacceptable to many consumers. But it would appear unreasonable on its face to allow a jury to conclude from this that the introduction of the 110 camera, which millions of other customers welcomed eagerly, was improper conduct.

**39.** Thus, the situation might be completely different if, upon the introduction of the 110 system, Kodak had ceased producing film in the 126 size, thereby compelling camera purchasers to buy a Kodak 110 camera. Or had Kodak shifted production in all formats from Kodacolor X to Kodacolor II before other photofinishers could process the new film, it would force photographers to procure their photofinishing services from CP&P. In such a case the technological desirability of the product change might bear on the question of monopolistic intent. *See Response of Carolina, Inc. v. Leasco Response, Inc.*, 537 F.2d 1307, 1330 (5th Cir. 1976).

**40.** Indeed, Kodak apparently did precisely that in introducing the 110 camera. Aware of the camera's substantial red-eye problem, the firm evidently decided "to provide enough ambient light for exposure without flash" at the press conference announcing the new system. This

phasizes a product's strengths and minimizes its weaknesses does not, at least unless it amounts to deception, constitute anticompetitive conduct violative of § 2.[41]

We conclude, therefore, that Kodak did not contravene the Sherman Act merely by introducing Kodacolor II simultaneously with the Pocket Instamatic and advertising the advantages of the new film for taking pictures with a small camera.

### 3. Restriction of Kodacolor II to the 110 Format

There is another aspect to Berkey's claim that introduction of Kodacolor II simultaneously with the Pocket Instamatic camera was anticompetitive. For eighteen months after the 110 system introduction, Kodacolor II was available only in the 110 format. Since Kodak was the first to have the 110s on the market, Berkey asserts it lost camera sales because consumers who wished to use the "remarkable new film" would be compelled to buy a Kodak camera. This facet of the claim, of course, is not dependent on a showing that Kodacolor II was inferior in any respect to Kodacolor X. Quite the opposite is true. The argument is that, since consumers were led to believe that Kodacolor II was superior to Kodacolor X, they were more likely to buy a Kodak 110, rather than a Berkey camera, so that the new film could be used.

Where a course of action is ambiguous, "consideration of intent may play an important role in divining the actual nature and effect of the alleged anticompetitive conduct," *United States v. United States Gypsum Co.*, 438 U.S. 422, 436 n.13, 98 S.Ct. 2864, 2873 n.13, 57 L.Ed. 854 (1978); *accord, e. g., Sargent-Welch Scientific Co., supra,* 567 F.2d at 712. We shall assume *arguendo* that Kodak violated § 2 of the Sherman Act if its decision to restrict Kodacolor II to the 110 format was not justified by the nature of the film but was motivated by a desire to impede competition in the manufacture of cameras capable of using the new film. This might well supply the element of coercion we found lacking in the previous section. We shall assume also that there was sufficient evidence for the jury to conclude that the initial decision to market Kodacolor II exclusively in the 110 format during its introductory period was indeed taken for anticompetitive purposes.[42]

But to prevail, Berkey must prove more, for injury is an element of a private treble damages action. Berkey must, therefore, demonstrate that some consumers who would have bought a Berkey camera were dissuaded from doing so because Kodacolor II was available only in the 110 format. This it has failed to establish. The record is totally devoid of evidence that Kodak or its retailers actually attempted to persuade

rather obvious ploy certainly did not amount to the type of deception that might, as we indicate in the following footnote, support an action under § 2.

**41.** There was evidence that Kodak indicated on the boxes in which Kodacolor II was sold that the film had a shelf life of 14 months, whereas in fact the film lost half its speed within three to six months. We need not decide whether this action amounted to deceptive advertising, or whether and under what circumstances such deception might amount to a violation of § 2. *See* 3 P. Areeda & D. Turner, *supra,* at 278–79. The Sherman Act is not a panacea for all evils that may infect business life. Before we would allow misrepresentation to buyers to be the basis of a competitor's treble damage action under § 2, we would at least require the plaintiff to overcome a presumption that the effect on competition of such a practice was *de minimis. See id.* Berkey, however, has failed to provide any evidence that a significant number

of Kodak 110 purchasers would have, if the Kodacolor II boxes had included accurate information on the shelf life of the film, bought a Berkey camera in a pre-existing format instead.

**42.** We have already stated that in September 1967 Kodak's management noted that development of the new film was justified, even if Project 30 were never brought to fruition, because of the benefits it would yield to pre-existing formats. Kodak, however, tentatively decided at the same meeting that Kodacolor II would at first be sold in the 110 format only. *See* Part III.A *supra.* Kodak's explanation for the initial restriction of Kodacolor II to the 110 size is that the advantages of the new film were most useful for small cameras; until the defects in Kodacolor II were eliminated, therefore, Kodak preferred to continue selling Kodacolor X in pre-existing formats. That Kodak did not advertise the restriction was evidence in support of its assertion that the plan was not undertaken for an anticompetitive purpose.

customers to purchase the Pocket Instamatic because it was the only camera that could use Kodacolor II, or that, in fact, any consumers did choose the 110 in order to utilize the finer-grained film.

To be sure, some of Kodak's advertisements emphasized the superior qualities of Kodacolor II, but the gist of these messages was merely that Kodacolor II, unlike previous films, would yield, "big, sharp pictures" from a small camera. In short, Kodak simply claimed to have achieved its goal of truly developing a Pocket Instamatic system whose color prints would be "as close as possible to the prints currently obtained from 126-size Kodacolor X." Stressing the "pocketability" of the 110 format, Kodak did not emphasize Kodacolor II as an independent reason to choose a photography system. Little of the advertising mentioned Kodacolor II by name. Of even greater weight is the fact that none in any way implied that the new film was available only in the 110 size. Accordingly, the content of Kodak's publicity, standing alone, would not permit a jury rationally to infer that Berkey was injured by the restriction of Kodacolor II to the 110 format.

The abstract possibility nevertheless remains that there might have been some customers who would have purchased a Berkey camera in one of the pre-existing formats but decided to select a Kodak 110 instead because they were aware that there was no alternative means of using Kodacolor II, even in the absence of advertising to that effect. Yet, although millions of amateur photographers bought Pocket Instamatics, Berkey did not produce anyone at the trial to testify that he was so motivated. Nor did Berkey present the testimony of camera dealers, or evidence of any kind, to establish that such customers existed. Indeed, Berkey declined to challenge the testimony of a camera dealer that he never promoted the fact that Kodacolor II was available only in the 110 size.[43] We ex-

pressed our concern over the absence of such evidence at oral argument, but Berkey's post-argument brief [44] did not point to any relevant items in the record that we had overlooked. We conclude, therefore, that the jury could not find that Berkey suffered more than *de minimis* injury, if any, because Kodacolor II was limited to the 110 format. Although the antitrust laws afford latitude in permitting the factfinder to estimate "the extent of the damages" where precise calculation is impossible, they do not allow recovery where there has been no showing that plaintiff suffered cognizable injury. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562–63, 51 S.Ct. 248, 26 L.Ed.2d 83 (1931); *see Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *Gottesman v. General Motors Corp.*, 436 F.2d 1205, 1210 (2d Cir. 1971).

Voluminous discovery and a prolonged trial have already given Berkey more than ample opportunity to adduce evidence, which it failed to do, in support of its consistently maintained claim that it lost camera sales because of restriction of Kodacolor II to the 110 format. It would make a mockery of the adversary system in a case of this character, where great expenditures of time and money have been made and where the plaintiff was represented by counsel of extraordinary ability and experience, to afford a new trial so that missing elements of proof could be produced, if, indeed, they exist.

To summarize our conclusions on the 110 camera claims, we hold:

1. Kodak was under no obligation to predisclose information of its new film and format to its camera-making competitors.

2. It is no basis for antitrust liability that Kodacolor II, despite certain deficiencies compared to Kodacolor X, may have encouraged sales of the 110 camera.

---

**43.** Advertisements of dealers, like those of Kodak, emphasized that Kodacolor II would yield sharp pictures but not that the film was exclusively available in the 110 size.

**44.** Because of the extraordinary complexity of this case, we invited the parties to submit post-argument briefs on any aspect of the case they felt merited further attention.

3. Finally, although the restriction of Kodacolor II to the 110 format may have been unjustified, there was no evidence that Berkey was injured by this course of action.

We, therefore, reverse so much of the judgment as awarded Berkey damages based on the introduction of the 110 camera.[45]

## B. Photofinishing and Photofinishing Equipment Markets

The introduction of the 110 system provided the foundation not only for the enormous camera award but also for the much smaller damage items—$55,700 and $19,000, respectively, before trebling—allotted for lost photofinishing profits and for overcharges on photofinishing equipment. These verdicts, moreover, were the basis for the only injunctive relief decreed below. We reverse and remand for a new trial so much of the judgment as was based on damages for the photofinishing and equipment claims, and we vacate and remand the equitable decree for further consideration in light of the principles set forth in this opinion.

### 1. Damages

Berkey's damages claims here are based on the fact that Kodacolor II, introduced along with the 110 camera, required the new, high-temperature C-41 finishing process instead of the C-22 process used for Kodacolor X and similar films. Thus independent photofinishers could not offer processing service for Kodacolor II—the only color print film Kodak ever offered in the 110 size—until they bought new equipment and received instruction in and supplies for C-41 processing. Moreover, Kodak did not give advance warning to the independents that the new film would be introduced, nor did it predisclose the C-41 process to other makers of photofinishing equipment. Accordingly, CP&P was able to begin processing Kodacolor II several weeks before its competitors.

Furthermore, it is urged that Berkey faced greater expense in finishing Kodacolor II than did CP&P, because Kodak refused to divulge the formulae for chemicals used in the C-41 process. Large photofinishers like Berkey preferred to buy these compounds from chemical suppliers in bulk, both to save money and to gain flexibility. But to be able to process Kodacolor II, they were forced to buy pre-mixed "kits" from Kodak at twice the price. Kodak, meanwhile, provided all but one of the CP&P plants with bulk chemicals.[46] And, because for some time Kodak was the only manufacturer of machinery capable of processing the new film, the independent photofinishers were required to purchase this equipment in order to proceed at all. The jury found that Kodak's prices were excessive and almost certainly found also that the equipment Kodak sold to the independents was vastly inferior to its product for CP&P.

Because of its early jump and greater efficiency in the C-41 process, CP&P gained a disproportionately high share of 110 finishing, an effect Berkey contends lasted through the end of 1973. There was clear evidence that Kodak was aware of the impact its conduct would have on the business of its photofinishing rivals. One Kodak marketing officer urged introduction of Kodacolor II along with the 110 cameras in part to compel the independent photofinishers to buy Kodak C-41 equipment,[47] and Kodak engineers realized that the machinery their firm planned to sell would not allow independents to do more than "limp through the C-22 to P-118 transition

---

**45.** But see Part V infra, where we hold that Berkey's claim arising from the introduction of the "flipflash" in 1975, the damages for which were not considered separately but were included in the total computation of damages for lost 110 camera sales, must be submitted to a new trial on these damages only.

**46.** Kodak also did not inform independent photofinishers, or even its own technical sales representatives assigned to help the independents process Kodak films, that there were two distinct "populations" of Kodacolor II with markedly different color characteristics. CP&P, however, was told of this divergence as soon as it was discovered.

**47.** See Part III.A supra.

stage." Not surprisingly, one Kodak scientist noted early in the development of the 110 system that the new process would "raise hell in the photofinishing business" without benefit to the consumer.[48] And, shortly after Kodacolor II came to market, a worried Kodak employee predicted that CP&P's announcement of its early readiness to process the new film would "cause some photofinishing reaction due to the fact that we are using 110 to gain business over their operations."

Kodak's conduct with respect to the independent photofinishers perhaps may be criticized as shoddy treatment of firms providing an essential service for Kodak products. Indeed, largely for that reason a number of Kodak employees urged that photofinishers and equipment manufacturers be given advance warning of the C–41 process. The purpose of the Sherman Act, however, is not to maintain friendly business relations among firms in the same industry nor was it designed to keep these firms happy and gleeful. *See Kestenbaum v. Falstaff Brewing Corp.*, 575 F.2d 564 (5th Cir. 1978). Moreover, it is clear that Kodak did not monopolize or attempt to monopolize the photofinishing or equipment markets.[49] Thus, it is not liable under § 2 for the actions described above unless it gained a competitive advantage in these markets by use of the monopoly power it possessed in other segments of the industry.

It bears emphasis that only the wielding of power will support recovery in this context; advantages inuring to Kodak's photofinishing and equipment arms by virtue of membership in an integrated firm will not. As we suggested earlier, a use of monopoly power is an action that a firm would have found substantially less effective, or even counterproductive, if it lacked market control. Thus, the classic example of such a use is a refusal to deal in goods or services needed by a competitor in a second market. *E. g., Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927). But, a firm without control of the market that attempts this will simply drive the purchaser to take its patronage elsewhere.

Similarly, suppose that Kodak was aware that most consumers would prefer Kodacolor X but nevertheless decided to replace it by Kodacolor II, hoping thereby to place competing photofinishers at a disadvantage. A small film manufacturer attempting this tactic would find it ineffective and self-destructive—the slack in C–22 films would be filled by other firms, and consumers would have no reason to buy a film they did not like. Kodak, by contrast, would face a far different calculus: consumers desiring film would have little choice but to buy Kodacolor II and would thereby ineluctably strengthen CP&P's hand in photofinishing.

It is not clear, however, whether in bringing forth the 110 system Kodak did anything that a smaller firm with integrated capabilities but no market control might not have done.[50] Kodak did not use its power to shift the entire photofinishing market from C–22 to the C–41 process, for

---

**48.** *See id.*

**49.** *See* Part II.C. & n.13 *supra.* Although Kodak was for a time the only firm able to finish Kodacolor II, and for a longer period the only company able to provide equipment for the C–41 process, the new process and the machinery used in it did not define separate markets; rather, they were, like Kodacolor II and the 110 camera itself, new entries in markets of wider scope. Kodak held a temporary monopoly in C–41 processing and equipment only in the sense that every firm initially possesses a 100% market share in its own innovations and the peripheral products and services associated with it. *See Telex Corp. v. International Business Machines Corp.*, 510 F.2d 894, 915 (10th Cir.), *cert. dismissed*, 423 U.S. 802, 96 S.Ct. 8,

46 L.Ed.2d 244 (1975) (endorsing district court statement).

**50.** We do not, of course, intend to cast any doubt on the well-established doctrine, which we have reaffirmed, *see* Part II.B *supra*, that certain actions may violate § 2 when taken by a monopolist even though they would be perfectly legitimate in the hands of a firm lacking market control. Rather, our consideration rests on a simple proposition: if an action that gains a firm a competitive advantage is effective because of the company's efficiency, prestige, and innovativeness, and not because of its control over the market, the action is not a use of power.

Kodacolor II was introduced only in the 110 size and at first represented a minuscule percentage of all color print photofinishing. Indeed, the film was not marketed in other formats until eighteen months later, long after the original surprise had worn off.[51] In sum, Kodak's ability to gain a rapidly diminishing competitive advantage with the introduction of the 110 system may have been attributable to its innovation of a new system of photography, and not to its monopoly power. On the other hand, we cannot dismiss the possibility that Kodak's monopoly power in other markets was at least a partial root of its ability to gain an advantage over its photofinishing competitors and to sell them overpriced equipment. For example, it may be that, had Kodak possessed only a small portion of the film market, other manufacturers would have found it more feasible to bring out their C–22 films in the 110 size. CP&P would then have had no competitive advantage for a large percentage of 110 photofinishing. Moreover, absent a Kodak film monopoly, the independent photofinishers might not have felt an urgent need to buy expensive equipment for the C–41 process.[52]

■ We cannot resolve this ambiguity. The instructions to the jury did not draw with sufficient sharpness the distinction between exercises of power and the natural benefits of size and integration. Nor is the record so clear that we can say with certainty on which side of this demarcation the facts fall. The parties quite naturally gave relatively little attention to this aspect of the case, in light of the comparatively small sums involved. If the parties wish to pursue these claims to a final determination, therefore, a new trial will be necessary.

### 2. Equitable Relief

Although Berkey's claim for damages in the photofinishing market was limited to the events surrounding the 110 introduction, the plaintiff also made extensive allegations that Kodak had used its control over other markets to disadvantage photofinishing competitors. For example, Berkey complained about Kodak's policy, evidently discontinued after the commencement of this suit, in the sale of color paper. The emulsions on each production run of paper are slightly different, yielding a variance of color characteristics. Because tests and machinery adjustments are necessary each time a roll of paper from a new "emulsion run" is used, large photofinishers like Berkey naturally wish to buy as many rolls as possible from a single run. Kodak, however, refused to sell more than 400 rolls from any one run to each photofinisher. Given Kodak's monopoly power in color paper, this refusal to deal would, unless justified by a valid business reason, appear to violate § 2 and form the basis for a grant of equitable relief.

Citing several examples of what he considered to be uses of Kodak's "spectrum of monopoly powers" as a lever in the photofinishing field, Judge Frankel issued a wide-ranging decree that requires the defendant, as he explained, "to treat all photofinishers, including CP&P, alike in relevant respects." Accordingly, any technical information made available by any other branch of Kodak to CP&P must also be offered promptly—on the payment of a $200 annual fee to cover postage, printing, and handling—to all domestic firms providing amateur photofinishing services.

■ It is evident from our discussion, however, that this decree forecloses not only the use of monopoly power but the legitimate benefits of integration as well.

**51.** In 1972, fewer than one-tenth as many rolls of Kodacolor film were processed in the 110 format as were finished in the 126 size, and CP&P processed only about 15% of the 110 rolls. Even in 1973, photofinishers processed more than three times as many 126 Kodacolor rolls—nearly all of it Kodacolor X—as Kodacolor rolls in the 110 format, and CP&P's share in the 110 size fell to approximately 6%.

**52.** We do not hold that Kodak, which did not have a monopoly in photofinishing equipment, was required to provide such machinery for other photofinishers. But a violation might be found if Kodak's ability to market equipment at an excessive price was attributable to its monopoly power in other areas.

Although an injunction need not be limited to prohibiting repetition of past misconduct, it does not lie within the discretion of the trial judge to restructure a market that Kodak has neither monopolized nor attempted to monopolize. *Cf. Schine Chain Theatres, Inc., supra,* 334 U.S. 125–30, 68 S.Ct. 947; *Paramount Pictures, Inc., supra,* 334 U.S. at 166–75, 68 S.Ct. 915. This portion of the judgment must therefore be vacated. On remand the district court may consider whether a narrower decree, limited to the prevention of uses of monopoly power, may be appropriate. In this regard, the court should consider to what extent the erosion of Kodak's share in the camera and color paper markets lessens the need for injunctive relief.

The decree also mandated the sale of color paper without a Kodak backprint, at the option of the purchaser. Judge Frankel indicated that Kodak's insistence on placing its backprint on the paper "was, or could be found to be, a device to force Kodak's photofinishing rivals to advertise their competition." Judge Frankel did not expressly consider whether his prohibition was a justifiable curtailment of Kodak's trademark rights. Whatever the merits of such a decree may be in the abstract—and the judge himself indicated at one point that its primary impact would be to benefit Kodak's color paper competitors [53]—the need for its is nullified by Judge Frankel's own observation that Berkey's purchases of Kodak paper fell in 1977 to 7% of its requirements. We therefore direct that the "backprint" relief be eliminated from any decree to be entered on remand.

### IV. FILM AND COLOR PAPER CLAIMS

The second and third largest jury awards were those for monopolization of film and color paper, $11,500,000 and $8,803,000, respectively. Judge Frankel upheld the film verdict but granted judgment n. o. v. for Kodak on color paper. Kodak therefore appeals the former judgment and Berkey the latter. In each of these claims Berkey's contention is that it paid an excessive price for Kodak products. They therefore raise similar issues and we shall discuss them together. We remand both claims for retrial.

It is clear that Kodak possessed a monopoly in the film and color paper markets during the period relevant to this suit. Berkey contends that this power, which enabled Kodak to overcharge its customers, was acquired and maintained, at least in part, by anticompetitive conduct. Some of the evidence introduced by Berkey in support of its claims concerned events that occurred many years ago. In particular, Berkey succeeded in introducing a 1915 decision—which was to play a dramatic role in an unfortunate incident near the close of the liability trial [54]—holding *inter alia* that Kodak, by illegal acquisitions and other improper conduct, had monopolized the photographic paper market. Judge Frankel admitted this evidence as "background" only. Over Berkey's objection, he instructed the jury that it could not base liability on anticompetitive actions that Kodak had committed earlier than the beginning of the limitations period on January 29, 1969, four years before the commencement of suit.

Berkey contends, however, that Kodak has also bolstered its power since 1969 by numerous exclusionary means. In upholding the film verdict against Kodak's motion for judgment n. o. v., Judge Frankel pointed to two particular tactics that he considered to be exclusionary. Most importantly, he held that there was sufficient evidence for the jury to conclude that the introduction of the 110 system illegitimately buttressed Kodak's film sales. The judge also indicated that Kodak improperly stifled film competition by preventing CP&P, its photofinishing arm, from servicing non-Kodak films.

---

**53.** Judge Frankel's opinion appears to contradict itself on this point. *Compare Berkey Photo, Inc. v. Eastman Kodak Co.,* 457 F.Supp. 404, 425 (S.D.N.Y.1978) *with id.* at 433.

**54.** *See* Part V *infra.*

Judge Frankel concluded, with some hesitation, that the evidence of anticompetitive conduct within the limitations period was sufficient to support the entire liability award. The trial judge also had misgivings about his instruction to the jury on the measure of film damages, in which he explained that Berkey could recover the difference between Kodak's monopoly price and the price it would have paid for film in a competitive market. Nevertheless, he denied Kodak's motion for judgment n. o. v., sustaining the award of damages *in toto*.

Berkey's color paper claim did not fare as well in Judge Frankel's hands, however. As with the film claim, Berkey presented numerous instances of conduct that, it contended, were anticompetitive. Kodak, it charged, manipulated the structure of the photofinishing market to inhibit color paper competition and used its monopoly power in film to advantage its paper sales, designing its films so that they would not be as compatible with competitors' paper as with Kodak's. Moreover, CP&P received instructions to buy only Kodak paper, even though competing products offered advantages in both cost and quality. Judge Frankel surveyed these and other allegations and concluded that in each case either Kodak's conduct was perfectly proper, or that there was insufficient proof that it was tainted by anticompetitive purpose or effect, or that it had no impact on the color paper market. Accordingly, although there was clear evidence that Kodak's monopoly power had enabled it to maintain its color paper prices at a high level, the judge granted Kodak's motion for judgment n. o. v. on this claim.

█ Excessive prices, maintained through exercise of a monopolist's control of the market, constituted one of the primary evils that the Sherman Act was intended to correct. Letwin, *Congress and the Sherman Antitrust Law: 1887–1890*, 23 U.Chi.L.Rev. 221, 249–52 (1956). Where a monopolist has acquired or maintained its power by anticompetitive conduct, therefore, a direct purchaser may recover the overcharge caused by the violation of § 2. *E. g., Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 487–94, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968).

█ But unless the monopoly has bolstered its power by wrongful actions, it will not be required to pay damages merely because its prices may later be found excessive. Setting a high price may be a use of monopoly power, but it is not in itself anticompetitive. Indeed, although a monopolist may be expected to charge a somewhat higher price than would prevail in a competitive market, there is probably no better way for it to guarantee that its dominance will be challenged than by greedily extracting the highest price it can. *See, e. g.,* L. Sullivan, *supra,* at 117; 3 P. Areeda & D. Turner, *supra,* at 41–42. If a firm has taken no action to destroy competition it may be unfair to deprive it of the ordinary opportunity to set prices at a profit-maximizing level. Thus, no court has required a lawful monopolist to forfeit to a purchaser three times the increment of its price over that which would prevail in a competitive market. 1 M. Handler, *supra,* at 56–57. Indeed, as one commentator who might favor such a rule concedes, such judicial oversight of pricing policies would place the courts in a role akin to that of a public regulatory commission. *Id.* We would be wise to decline that function unless Congress clearly bestows it upon us. *See* L. Sullivan, *supra,* at 117–18.

█ For a purchaser to recover damages under § 2, therefore, it must demonstrate that the monopolist has engaged in some anticompetitive conduct. Two further questions must be resolved, however, to give shape to the purchaser's treble damage suit:

1. If an overcharge paid during the limitations period was caused by the defendant's monopoly power, may a plaintiff satisfy the conduct element of the § 2 offense by proving anticompetitive actions that occurred more than four years prior to the commencement of suit?
2. If a defendant has violated § 2, may a purchaser recover the excess of its price over a competitive price, or merely the increment attributable to its anticompetitive conduct?

We hold that Judge Frankel erred in Kodak's favor on the first of these questions but that he was overly generous to Berkey on the second.

### A. Conduct Prior to the Limitations Period

By statute, 15 U.S.C. § 15b, a four-year period of limitations applies in private antitrust suits. The plaintiff, therefore, clearly can recover only for overcharges suffered since the beginning of the limitations period. It remains to be decided, however, whether the conduct element of the offense may be satisfied by wrongful action occurring before the limitations period but that nevertheless made an enduring contribution to the monopolist's ability to charge an excessive price. Judge Frankel, without articulating reasons, concluded that § 15b requires a negative answer.

■■■ Unless tolled, that provision requires suit to be "commenced within four years after the cause of action accrued." In effect, therefore, the judge held that the cause of action of a purchaser seeking to recover an illegal overcharge accrues when the defendant engages in the anticompetitive conduct that is a prerequisite for suit. We believe that the purchaser's claim cannot accrue until it actually pays the overcharge. Accordingly, Judge Frankel's ruling was erroneous.

It is "plain from the treble-damage statute itself [15 U.S.C. § 15]" that "a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971). Although the business of a monopolist's rival may be injured at the time the anticompetitive conduct occurs, a purchaser, by contrast, is not harmed until the monopolist actually exercises its illicit power to extract an excessive price. The case of predatory pricing illustrates the point clearly. As soon as the dominant firm commences such a policy, other producers, who may be driven out of the market, are injured. But, clearly, purchasers are not, for they receive the temporary boon of artificially low prices. It is only when the monopolist, having devoured its smaller rivals, enjoys the spoils of its conquest by boosting its price to excessive levels that a purchaser "feels the adverse impact" of the violation. *Id.* at 339, 91 S.Ct. 795. And if the monopolist never consummates its scheme by taking this final step, the purchaser has no cause of action.

So long as a monopolist continues to use the power it has gained illicitly to overcharge its customers, it has no claim on the repose that a statute of limitations is intended to provide. Thus, in this setting, as in "the context of a continuing conspiracy to violate the antitrust laws. . . . each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act. . . . . [A]s to those damages, the statute of limitations runs from the commission of the act." *Id.* at 338, 91 S.Ct. at 806.

Untoward consequences would follow were we to hold that the anticompetitive conduct itself triggered the running of the limitations period. As the Supreme Court stated in *Zenith Radio:*

> [I]t is hornbook law, in antitrust actions as in others, that even if injury and a cause of action have accrued as of a certain date, further damages that might arise from the conduct sued on are unrecoverable if the fact of their accrual is speculative or their amount and nature unprovable. *Id.* at 339, 91 S.Ct. at 806.

Plainly, at the time a monopolist commits anticompetitive conduct it is entirely speculative how much damage that action will cause its purchasers in the future. Indeed, some of the buyers who will later feel the brunt of the violation may not even be in existence at the time. *Cf. Continental Ore Co., supra,* 370 U.S. at 709–10, 82 S.Ct. 1404. Not until the monopolist actually sets an inflated price and its customers determine the amount of their purchases can a reasonable estimate be made. The purchaser's cause of action, therefore, accrues only on the date damages are "suffered":

Otherwise future damages that could not be proved within four years of the conduct from which they flowed would be forever incapable of recovery, contrary to the congressional purpose that private actions serve "as a bulwark of antitrust enforcement." *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 139, 88 S.Ct. 1981, 1984, 20 L.Ed.2d 982 (1968). . . . .

*Zenith Radio Corp., supra,* 401 U.S. at 340, 91 S.Ct. at 807.

Our view is supported by the fundamental principles of § 2 that we outlined earlier in this opinion. Monopoly power, we indicated, is itself the primary target of § 2. To be sure, a showing of anticompetitive conduct is necessary to support liability for damages, for otherwise the law would be unfair to a firm that has gained success solely by fair means. But there can be no unfairness in preventing a monopolist that has established its dominant position by unlawful conduct from exercising that power in later years to extract an excessive price. After all, it is only a pristine "origin," *Alcoa, supra,* 148 F.2d at 429, that may save a monopoly—so long as it continues to refrain from anticompetitive activity—from the condemnation of § 2. The taint of an impure origin does not dissipate after four years if a monopolist continues to extract excessive prices because of it.

Moreover, it would undercut enforcement of the Sherman Act to hold that, if a monopolist merely retains its illicit market control for four years after its last anticompetitive action, it may charge an exorbitant price until its power is eviscerated in an appropriate suit for equitable relief.[55] The rule urged by Kodak would mean that, as the Supreme Court has indicated in a related context:

> those who had unlawfully built their empires could preserve them intact. They could retain the full dividends of their monopolistic practices and profit from the unlawful restraints of trade which they

had inflicted on competitors. Such a course would make enforcement of the Act a futile thing unless perchance the United States moved in at the incipient stages of the unlawful project.

*Schine Chain Theatres, Inc., supra,* 334 U.S. at 128, 68 S.Ct. at 957. An unlawful monopolist must be "deprived of the fruits" of its wrongful conduct, *id.* at 129, and one of the forbidden fruits is an excessive price. In *Grinnell,* Judge Wyzanski also used the biological metaphor: § 2 requires "the rooting out of a plant . . . [that] represents an ultimate growth from seeds which have been declared unlawful." 236 F.Supp. at 258. So long as a monopolist enjoys "the flower of evil," *id.,* at the expense of its customers, those victims must have a remedy.

We hold, therefore, that a purchaser suing a monopolist for overcharges paid within the previous four years may satisfy the conduct prerequisite to recovery by pointing to anticompetitive actions taken before the limitations period. It should not be inferred that this ruling grants antitrust plaintiffs a license to embark on a search for Ichthyosauria—that is, on a time-warped fishing expedition. A trial court in its discretion may always "set a reasonable cut-off date, evidence before which point is to be considered too remote to have sufficient probative value to justify burdening the record with it." *Continental Ore Co., supra,* 370 U.S. at 710, 82 S.Ct. at 1416. Moreover, the trial court might not be without flexibility to limit the proof where delay in bringing suit may have caused injustice to the defendants. *See* 3 P. Areeda & D. Turner, *supra,* at 93.

B. *Damages to a Monopolist's Purchaser*

■ Assuming that a purchaser establishes a monopolist's liability to it for an unlawful price, two potential rules of damages come into view. Judge Frankel apparently stated, and in any event the jury

---

**55.** If, as the Ninth Circuit has held in *International Telephone & Telegraph Corp. v. General Telephone & Electronics Corp.,* 518 F.2d 913, 922 (9th Cir. 1975), dissolution or divestiture may only be ordered in a Government suit—a question that we of course do not reach—the rule for which Kodak argues would be even less tolerable.

clearly acted upon, what may be called the competitive price theory—that a purchaser may recover for the entire excess of the monopolist's price over that which would prevail in a competitive market. We believe that this was error, and that the true measure of damages, which we shall refer to as the wrongful conduct rule, is the price increment caused by the anticompetitive conduct that originated or augmented the monopolist's control over the market.

There is a dearth of cases on point. Indeed, the only citation in Judge Frankel's discussion of this point is to a rather vague *dictum* in *Alcoa.* The reason for this lack of authority is that in most successful monopolization suits brought by purchasers the § 2 violation was merely a consequence of a § 1 offense that provided the rule of damages. Often, for example, the § 2 violation consists of a price-fixing conspiracy among firms controlling a large share of the market. The measure of the damages to one of the conspirators' customers is the difference between the price actually paid and the one at which the product would have sold absent the conspiracy. *E. g., Reiter v. Sonotone Corp.,* —— U.S. ——, ——, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979); *Chattanooga Foundry & Pipe Works v. City of Atlanta,* 203 U.S. 390, 396 (1906). In such a case, the monopoly price is entirely attributable to the anticompetitive conduct. The two alternative rules of § 2 damages therefore merge and it is impossible to tell which would apply if the monopoly power, and hence the excessive price, resulted only in part from wrongful conduct.[56]

Without any clear precedent to guide us, we must determine the proper measure of damages in a § 2 case by juxtaposing the basic rule for antitrust damages with the fundamental principles of law under § 2 that we outlined earlier in this opinion. The basic rule was set forth in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), where the Supreme Court declared that plaintiffs in an antitrust action must prove "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." It is true, as we have previously indicated, that excessive prices are "injury of the type the antitrust laws were intended to prevent." *See* Part II.A *supra.* It is equally evident, however, that more than monopoly power is necessary to make the charging of a noncompetitive price unlawful. Accordingly, a purchaser may recover only for the price increment that "flows from" the distortion of the market caused by the monopolist's anticompetitive conduct.

Were the law otherwise, it would establish an unnecessary and unwarranted trigger mechanism. *See* 3 P. Areeda & D. Turner, *supra,* at 86–87. A pristine monopolist, we have held, may charge as high a rate as the market will bear. But under the competitive price rule, if it committed any anticompetitive conduct—beyond a *de minimis* level—it would suddenly be held liable for threefold the entire excess of its price over a competitive price. In effect,

---

**56.** To the extent that any inference may be gleaned from the extended *Hanover Shoe* litigation, it favors the wrongful conduct rule. After the Supreme Court affirmed Judge Wyzanski's judgment in the celebrated *United Shoe* case, Hanover, a United customer, brought an action to recover illegal overcharges. The calculation of Hanover's damages was based on "the excess of leasing costs over what it would have cost to own the same machines had they been available for purchase," *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 245 F.Supp. 258 (M.D.Pa.1965); *see Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 487, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). Significantly, the hypothetical purchase prices for prior years were determined from the actual prices for 1955—the first year the lease-only machines were offered for sale and clearly, as later litigation would demonstrate, a period in which United retained its monopoly. *See United States v. United Shoe Machinery Corp.,* 266 F.Supp. 328, 331 (D.Mass.1967), *rev'd on other grounds,* 391 U.S. 244, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968). Moreover, United's anticompetitive leasing policy was only a partial source of its monopoly power; the other roots were, as Judge Wyzanski indicated in his original opinion, "plainly beyond reproach." 110 F.Supp. at 344. It appears, therefore, that damages in *Hanover Shoe* were limited to the price excess caused by United's wrongful conduct.

instead of being required simply to compensate its customers for the consequences of its wrongful action, it would be required to forfeit its legitimately acquired advantage. But the Sherman Act does, as we have said, tolerate the lawfully acquired and maintained monopoly. This principle would be undercut if a monopolist whose position has for the most part been attained legitimately is required to forfeit all fruits of its success because its power has merely been supplemented by improper conduct.[57]

We recognize that if the monopolist, but for its illegitimate actions, would have had little or no market power, the wrongful conduct and competitive price rules may yield very similar results. The proper standard, though, is one that bases damages on the monopolist's actual record of misconduct.[58]

### C. Summary and Dispositions

The two issues we have discussed above establish the framework for a purchaser's action under § 2 of the Sherman Act. We believe this structure is not only compelled by law but sensible as well. The wrongful conduct rule indicates that a purchaser can recover for an overcharge paid to a violator of § 2 only to the extent that the price he paid exceeds that which would have been charged in the absence of anticompetitive action. An intermediate step in the analysis may be an attempt to estimate what the monopolist's market share would likely have been but for the illegitimate conduct; it would then be possible to gauge approximately what price the defendant would have been able to charge with that degree of market control. In any event, courts applying this rule must be aware of the practical limits of the burden of proof that may be demanded of treble damage plaintiffs. See Zenith Radio Corp., supra, 395 U.S. at 123, 91 S.Ct. 795; Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264–65, 66 S.Ct. 574, 90 L.Ed. 652 (1946); Story Parchment Co., supra, 282 U.S. at 563, 51 S.Ct. 248.

It may, of course, be difficult for a purchaser to demonstrate that conduct occurring many years before the commencement of suit contributed to an overcharge that it paid within the limitations period. That, however, is no reason for denying it the opportunity to do so. The treble damage provision, 15 U.S.C. § 15, was intended in large part as an inducement to encourage potential plaintiffs to endure the considerable expense and labor of seeking recovery against violators of the antitrust laws. E. g., Reiter, supra, —— U.S. at ——, 99 S.Ct. 2326.

It is clear from our holdings that we believe both the film and color paper claims must be remanded for retrial. Judge Frankel upheld the film award for the entire excess of Kodak's prices over a hypothetical competitive price, although the only two examples of post-1969 conduct that he believed were wrongful could not have had a very large impact on Kodak's film prices. The verdict therefore cannot stand, but Berkey has a right to establish at a new trial that anticompetitive conduct, both before and after 1969, enhanced the price it paid for Kodak film.

Similarly, the judgment for Kodak on the color paper claim must be vacated. Judge Frankel did not allow the jury to consider pre-1969 conduct as a foundation for the verdict—despite the concession by Kodak's own economic expert, to be discussed later, that the company's unlawful activities in

---

**57.** The situation might be different in a Government equity action. It is interesting to note that Areeda and Turner would allow the break-up of a persistent monopoly in such a suit even in the absence of exclusionary conduct, 3 P. Areeda & D. Turner, supra, at 63–64. They strongly advocate the position we are asserting here, however—that "an injured plaintiff is not entitled to have damages based on the excess of the monopoly price over the competitive price but only to the price increment reasonably attributable to actionable behavior." Id. at 73; see id. at 99.

**58.** We express no view on how the trial judge should allocate the burden of proving this causal relation, or lack of it, when plaintiff makes a preliminary showing of persistent monopoly power and a substantial history of anticompetitive conduct. Cf. Ohio Valley Electric Corp. v. General Electric Co., 244 F.Supp. 914, 946 (S.D. N.Y.1965).

years past may still have had a bearing on its power in the photographic paper market. Because Judge Frankel erred by instructing the jury on the competitive price theory of damages, however, we could not simply reinstate the large color paper award, even if we were to hold that the jury may validly have found that Kodak committed anticompetitive conduct in that market since 1969.

We have no occasion to consider the parties' arguments concerning the numerous other Kodak activities that, Berkey contends, were anticompetitive. Because of the general form of the verdicts, we have no way of knowing what the jury's findings were on these matters or which actions were believed to be anticompetitive. Nor do we know what the findings will be on retrial, if this litigation should continue. Indeed, now that we have set forth the broad outlines of principles in this area we earnestly hope that able counsel on both sides will find a way to dispose of this mammoth lawsuit without consuming more court time or incurring more legal expenses. If so, it will not be necessary to resolve any of the lesser questions. If not, there will be no need to retry the issue of monopoly power. Judge Frankel's instruction on this point appears to have been essentially correct, and there was clear evidence supporting the jury's implicit finding that Kodak held such power in the film and color paper markets.

## V. THE SECTION 1 CLAIMS

Our discussion thus far has centered around interpretation and application of the provisions of the Sherman Act to actions taken by Kodak alone. Berkey claims in addition, however, that Kodak engaged in two separate conspiracies, with the General Electric Company and Sylvania Electric Products, Inc., to restrain trade in the, use of new flash devices with amateur cameras.

### A. Background

Amateur photography performed in dim lighting ordinarily requires separate illumination so the scene may be captured on film. This is usually achieved by affixing some type of flash device to the camera. Its purpose is to produce a brief, high-intensity burst of light when the shutter is released.

Kodak does not make such devices. For approximately fifteen years, however, it has engaged in three separate "joint development programs" with lamp manufacturers to ensure that the desired lighting innovations would be compatible with Kodak cameras. In 1963, Sylvania Electric Products, Inc. approached Kodak with a prototype of a new battery-powered light device—the flashcube [59]—and a modified Kodak 126 camera to fire it. Berkey argued that although Kodak did not make meaningful technical contributions to the flashcube, it nevertheless required Sylvania not to disclose its invention to any other camera manufacturer. Accordingly, for some time after the flashcube was introduced along with a line of Kodak flashcube cameras in 1965, Kodak was the only manufacturer able to sell cameras to use the device.[60]

Berkey is barred by the statute of limitations from seeking damages for what it terms the "flashcube conspiracy," but it urges that the events in 1963–65 do much to illuminate two more recent incidents. Viewed in the light most favorable to Berkey, as we have indicated the law requires us to do at this appellate juncture, the evidence established that in 1967 Sylvania came to Kodak with another flash invention—the magicube. This device was simi-

---

**59.** The flashcube contains four flashbulbs mounted on the face of a small cube, each containing its own reflector. The cube is rotated after each shot, so four flash pictures may be taken without the need to change cubes.

**60.** Several other camera makers complained bitterly to Sylvania following this episode. They were particularly disturbed that Sylvania had assigned its camera patents to Kodak, keeping only its lamp patents. One Sylvania official wrote:

> Also during the past years the royalties other camera manufacturers have paid to EK to use Sylvania flashcubes on their equipment have disturbed them deeply. They keep telling us that the flashcube was a Sylvania development . . . why did they have to pay royalties?

lar to the flashcube in appearance but did not require batteries. Instead, each of the four lamps in the cube was ignited by percussion, much as a bullet is fired when the firing pin strikes the cartridge. This was a major advance over the flashcube, eliminating dead batteries and other electrical malfunctions that were major causes of lamp failures and consequent missed pictures.

Once more, the two firms entered into a joint project to exploit the Sylvania invention. Over Sylvania's protests, Kodak insisted again that details of the new device be withheld from the public and the trade. Kodak, Berkey contended, maintained this position until just two months before magicubes and magicube cameras were ready for shipment.[61] Sales of Kodak magicube cameras commenced in July 1970. Berkey, it appears, was the first competitor to offer its own magicube cameras, reaching the market in October, but its production capacity was at first limited. It was not until late 1971 that Berkey's magicube cameras were truly competitive with Kodak's.

Kodak's joint flash programs, however, were not confined to Sylvania. In 1969, the General Electric Company approached Kodak with proposals for several new flash devices. One was a percussion lamp similar to the magicube; another used a small crystal that could be economically built into a camera and that would, when struck, produce an electrical current sufficient to ignite flash material. The latter device, called "piezo" or "PE" because it used a piezoelectric crystal, provides the focus for the second conspiracy charged by Berkey.

Kodak was troubled by the GE proposal. It was already committed to Sylvania on the magicube project, and there was abundant evidence from which the jury could conclude that Kodak did not wish to introduce two new flash systems at approximately the same time.[62] Rather, its marketing strategy was, as we noted in connection with our discussion of the 110 system, to withhold introduction of improved camera models until the maximum benefit from the prior model had been reaped. The jury's verdict could reflect its belief that Kodak embarked on a carefully balanced campaign. Kodak desired to cool GE's ardor for its inventions sufficiently to delay introduction of the piezo device for several years, and, at the same time, to avoid the appearance of deferment so that the lamp manufacturer would not seek another camera maker to exploit its invention.[63]

After several years of intermittent discussion, Kodak and GE decided to move forward with the piezo device. In a contract executed on October 31, 1972, they agreed to aim for a Spring 1975 introduction of GE piezo flashlamps and Kodak cameras designed to fire them. Disclosure before hand to other lamp and camera manufacturers was forbidden. At a joint press conference in April 1975, the two firms announced the GE "flipflash"[64] and two

---

61. As Kodak's trial counsel conceded, there was conflicting evidence concerning the terms of the secrecy agreement. The written agreement permitted disclosure to "other responsible camera manufacturers," but Sylvania never made disclosure to anyone but Polaroid, which only manufactured instant cameras and was thus not a competitor of Kodak's. In October 1968, Sylvania pressed Kodak for an early announcement to the trade, but Kodak resisted, in part to "make sure that our foreign manufacturing plants could change to the new system." Kodak then instituted a "crash program" to get to market before, as the jury could have found, Sylvania unilaterally decided to disclose its invention to the trade.

In March 1970, Sylvania again complained to Kodak about delay, noting that rumors of the Kodak-Sylvania project had caused other camera manufacturers to press Sylvania for disclo-

sure. Kodak agreed to a limited form of disclosure, but refused to permit release of, inter alia, the design of the camera socket into which the magicube would fit.

62. In addition to the evidence adduced in connection with the 110 camera that Kodak had a policy of cyclical product introduction, a Kodak official testified that if the piezo would not be ready for the initial 110 introduction, Kodak could not use it for another two or three years.

63. For example, at a time when Kodak was committed to Sylvania and had shelved its own piezo plans, it complimented GE on its devices and urged them to continue development.

64. This device was a rectangular array of eight bulbs, set in four rows of two. The top four bulbs would be fired and the array would then

new lines of Kodak 110 cameras designed to accommodate it. Kodak had the field to itself for several months. This time, however, Berkey was not the first non-Kodak camera manufacturer to enter the arena. It did not market its own flipflash cameras until early 1976, months after Japanese and Chinese models had begun to appear.

#### B. *Joint Development Projects and § 1*

Berkey contends that Kodak's agreements with the magicube and flipflash manufacturers violated § 1 of the Sherman Act. In particular, it charges that although Kodak did not make any meaningful technological contribution to either system, the secrecy agreements it extracted from GE and Sylvania prevented other camera makers from competing in the production of cameras that could cooperate with the new flash devices. Evaluating all the evidence presented on these issues, the jury found Kodak's conduct to be unreasonable restraints of trade.

Kodak's challenge to these verdicts is relatively simple. It argues that both projects "involved millions of dollars of research and development expense by Kodak," and "led directly to the introduction of innovative new products" that "gained wide success." Accordingly, it urges, Berkey's § 1 claims are nothing more than "a mirror image" of the § 2 predisclosure arguments we rejected in Part II of this opinion.

There is a vast difference, however, between actions legal when taken by a single firm and those permitted for two or more companies acting in concert. To repeat a simple example, a monopolist may, assuming he acquired his power legally, charge any nonpredatory price for his product, but agreements among competitors to raise prices have been recognized as *per se*

violations of the Sherman Act since *Socony-Vacuum*. *See* Part II *supra*. We have stated that we respect innovation, and we have construed § 2 of the Act to avoid an interpretation that would stifle it. But this is *toto caelo* different from an agreement among a few firms to restrict to themselves the rewards of innovation. Such conduct is not immune to examination under § 1. Citing a case we believe to be inapposite,[65] Kodak contends that it is "not a 'restraint of trade,' reasonable or unreasonable, jointly to develop a new product." Where a participant's market share is large, however, we believe joint development projects have sufficient anticompetitive potential to invite inquiry and thus stand on a different footing.

Joint development programs can benefit competition, *see United States v. Line Material Co.*, 333 U.S. 287, 310, 68 S.Ct. 550, 92 L.Ed. 701 (1948), but they are not without their costs. In analyzing joint research by direct competitors, one commentator has suggested that if several substantial firms in an industry join in research at a scale the remaining firms could not attain, and if the others are not permitted to join the group, the favored competitors might obtain a decisive and unjustified advantage over the rest. L. Sullivan, *supra*, at 298–303. The benefits and detriments of joint research will vary with the circumstances, Sullivan suggests, and the market power of the participant firms is likely to be the most significant factor. *Id.; accord,* Turner, *Patents, Antitrust and Innovation*, 28 U.Pitt.L.Rev. 151, 158–59 (1966).

Kodak and GE, of course, are not direct competitors, and Kodak and Sylvania were at best potential competitors when the magicube was being developed.[66] Never-

---

be "flipped" and the remaining bulbs, now on top, would be used.

**65.** *United States v. Citizens & Southern National Bank*, 422 U.S. 86, 95 S.Ct. 2079, 45 L.Ed.2d 41 (1975), involved the antitrust implications of an attempt to evade Georgia's branch banking laws and has nothing to do with joint development ventures by firms in complementary markets.

**66.** Until 1962, Argus Camera was operated as a division of Sylvania. In May of that year, Sylvania sold Argus for a small amount of cash and $7.8 million in promissory notes. Over the next seven years, as a result of recapitalizations of Argus, Sylvania was, at various times, a major creditor, common shareholder, and preferred shareholder of its former division, on occasion placing a nominee on Argus's Board

theless, because of Kodak's market power over cameras, the exclusionary potential of horizontal research pools was present. In the case of the flipflash, for example, GE indicated early in 1971 that it could be at maximum production in two years. Kodak, however, counselled delay, at one point urging GE project officials to make a show of progress, "even if all you do is 'paint the red base black,'" so that "we'll feel free to work with you." Otherwise, Kodak said, GE could not be assured of being part of Kodak's future flash plans, for "we would then have to ask all [lamp] manufacturers" to submit ideas. A few months later, the two firms executed the formal agreement binding them to joint development of flipflash and nondisclosure to rival lamp and camera manufacturers. From this and other evidence, the jury could have found in the verdict it returned that, without any technological justification, GE kept a desirable innovation off the market for two years solely to suit Kodak's convenience. There is a hollow ring to a claim of justification by appeal to the need to promote innovation, where the result of the conduct was such a clear loss to consumers.

We hasten to add that we do not hold that joint development agreements between a monopolist and a firm in a complementary market are *per se* violations of § 1. It may be, for example, that the market structure is such that only a dominant firm will have the resources necessary to exploit the complementary technology being offered. If such were the case, the alternative to joint development could be no development at all. Accordingly, Judge Frankel appropriately rejected Berkey's request for a *per se* charge. *See generally Continental T. V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36,

49–50 & n.16, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Nevertheless, as Areeda and Turner have noted, joint ventures involving a monopolist have sufficient anticompetitive potential that they must be scrutinized with care lest they be permitted to fortify the already substantial entry barriers inherent in a monopolized market. 3 P. Areeda & D. Turner, *supra*, at 114. The relevant variables might include: the size of the joint venturers; their share of their respective markets; the contributions of each party to the venture and the benefits derived; the likelihood that, in the absence of the joint effort, one or both parties would undertake a similar project, either alone or with a smaller firm in the other market; the nature of the ancillary restraints imposed, and the reasonableness of their relationship to the purposes of the venture. This list is not intended to be exhaustive, nor do we suggest that each element applies to every case. In analyzing joint development agreements, as elsewhere in § 1, "the factfinder [must] weigh all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition," *Continental T. V., supra*, 433 U.S. at 49, 97 S.Ct. at 2557.

 On the record before us, we have little doubt that a properly instructed jury could find that the magicube and flipflash agreements violated § 1.[67] It remains, therefore, to examine Kodak's challenges to the charge to the jury. Kodak asserts that Judge Frankel erred in instructing the jury to consider whether (1) Sylvania's substantial interest in Argus Camera Co. rendered it a potential camera competitor of Kodak, and (2) the "legitimate purposes" of the

---

of Directors. Berkey contended that Sylvania's relationship with Argus permitted the jury to infer that the lamp manufacturer was a potential camera competitor as well.

67. In particular, there was in each instance evidence that Kodak used its camera monopoly to extract secrecy agreements from the lamp manufacturers, and that the benefits it derived from the agreements far exceeded the value of its technological contributions. We note, in passing, that Kodak contends that Berkey

should be barred from recovery because a Berkey official once told an officer of GE that Berkey was not interested in innovation, preferring to copy Kodak designs. The evidence concerning this conversation was conflicting, however, and we must assume the jury resolved the conflict in Berkey's favor. Accordingly, we need not determine the effect such a Berkey policy would have on its right to complain of Kodak's illicit agreements with the lamp makers.

magicube and flipflash agreements might be accomplished by "less restrictive alternatives" than those actually chosen. We believe, however, that the charge provided accurate guidance for the jury's deliberations.

Kodak claims that there was an absence of evidence that an agreement between it and Sylvania not to compete existed; this assertion, however, misses the point. As we noted above, the possibility of individual entry or expansion into the monopolized market is a highly relevant consideration in assessing a joint venture such as the magicube agreement. We agree with the district judge that Sylvania's large interest in Argus was sufficient to raise for the jury the possibility that absent the joint project with Kodak, Sylvania might have produced magicube cameras with Argus.

 More troublesome is the contention that Berkey would not have benefited had Sylvania chosen to "go it alone" and therefore lacked standing to raise the Argus issue. *Cf. Brunswick Corp., supra.* But magicube entry on the small scale available to Argus may well have been less harmful to Berkey—and to camera competition in general—than was entry by a monopolist such as Kodak. *See* 3 P. Areeda & D. Turner, *supra*, at 114. In any event, the only objection to the Argus charge that Kodak presented to the district court related to whether Sylvania's ownership of Argus was too remote in time to be relevant to the magicube project, not the "standing" and "non-competing agreements" contentions now raised on appeal. Accordingly, the latter objections have been waived. Fed.R.Civ.P. 51; *Spano v. N. V. Koninklijke Rotterdamsche Lloyd*, 472 F.2d 33 (2d Cir. 1973).

 Kodak also challenges a direction that the jury

should consider whether, under all the circumstances, the legitimate objectives of the programs might have been achieved by alternative means with less

restrictive effects, including predisclosure or provisions for royalty-free licensing. Kodak contends that this in effect directed a verdict for Berkey because, in retrospect, lawyers can always "conjure up some method of achieving the business purpose in question that would result in a somewhat lesser restriction of trade," *American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1249 (3d Cir. 1975). We agree with the Third Circuit that a better charge would be to require that "the restraints . . . not exceed 'the limits *reasonably necessary* to meet the competitive problems,'" *id.* (quoting *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 380–81, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967) (emphasis added by the court)). *American Motor Inns* noted, however, *id.* at 1248, that the existence of alternatives is obviously of vital concern in evaluating putatively anticompetitive conduct. *See, e. g., White Motor Co. v. United States*, 372 U.S. 253, 271–72, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963) (Brennan, J., concurring); *Foster v. Maryland State Savings & Loan Association*, 191 U.S. App.D.C. 226, 590 F.2d 928, 934–35 (1978), *cert. denied,* 439 U.S. 1071, 99 S.Ct. 842, 59 L.Ed.2d 37 (1979); 1 M. Handler, *supra*, at 708. Read as a whole, *see, e. g., Chavis v. Finnlines Ltd., O/Y*, 576 F.2d 1072, 1076 (4th Cir. 1978), Judge Frankel's § 1 charge simply presented the availability of less restrictive alternatives to the jury as one among many possibilities to be considered. The quoted paragraph did not in any way diminish the earlier instructions based on the rule of reason, including the specific admonition that no single test determines reasonableness.

 Finally, we must address Kodak's contention that even if the less restrictive language passes muster, the reference in this context to predisclosure as a specific alternative does not.[68] As is clear from both the charging conference and Kodak's requests to charge, Kodak views the "fact that these products were developed by two

68. Kodak has waived its right to contest the charge on royalty-free licensing by failing to raise an objection below. Fed.R.Civ.P. 51.

companies, rather than by Kodak alone" as immaterial to the issue of predisclosure. But, given the significantly different posture of single-firm and multi-firm conduct under the Sherman Act and Kodak's arguably minimal technological contributions to the two projects, we believe it was quite appropriate for the jury to consider whether Kodak's refusal to permit Sylvania or GE to disclose their inventions to other camera manufacturers was unreasonable.

Accordingly, we affirm the judgment insofar as it holds Kodak liable for violating § 1 of the Sherman Act by its conduct in the flash programs. The question of appropriate damages, however, still remains.

## C. *Damages*

The flipflash introduction was not the subject of a separate damage claim but rather was used as a secondary ground for the 110 camera award. Because we decided in Part III that the judgment must be reversed insofar as it allowed damages in connection with the introduction of the original 110 cameras, there must be a new trial to assess Berkey's damages arising out of the flipflash episode.

As for the magicube, Judge Frankel presented the damages claim to the jury in two parts, one for the latter half of 1970 and the other for 1971. The jury awarded Berkey $330,000, pretrebling, for lost camera sales in 1970. Judge Frankel upheld this award, and Kodak does not challenge it here. Berkey calculated its 1971 damages to be $1,759,000, but the jury awarded $1,417,330, a reduction of approximately 20%. Judge Frankel, however, granted judgment n. o. v. for Kodak on this award, and Berkey appeals.

Berkey's computation for 1971 was reached by comparing its 126 camera sales in that year to those in 1972. By then, Berkey argued, the deleterious consequences of the magicube conspiracy had dissipated, and so 1972 sales represented a fair estimate of the record Berkey's Keystone Division would have achieved the previous year had it been "at the starting line"

when the magicube was introduced. The trial court, however, rejected this theory as speculative. Judge Frankel pointed out that the dramatic 400% rise in Berkey camera sales in 1972 was not due solely to an increase in the availability and popularity of Berkey's magicube camera; indeed, Berkey's 126 magicube camera sales declined substantially in 1972. Rather, the augmentation of Berkey's market share was attributable to the introduction of a new and greatly improved version of its Everflash camera, which utilized a built-in electronic strobe light rather than a disposable cube. Thus, Judge Frankel held, the comparison urged by plaintiff "invited an award of damages measured by the success of Berkey's own innovation."

Berkey contends that the judge's ruling was based on an erroneous perception that the Everflash and magicube cameras were to be regarded as noncompeting products with no impact on one another. As Berkey points out, the jury's finding of a single relevant still camera market, including all 126 cameras as well as 110s, suggests that these products do compete with each other. The strobe built into the Everflash perhaps may be regarded merely as an alternative to the magicube as a light source for cameras that are otherwise similar. On the other hand, a Berkey executive testified that the Everflash introduced in late 1971 was a very different and markedly superior camera. These were factors that the jury was properly given to consider. Its verdict, representing a 20% deduction from Berkey's demand for 1971, suggests that it did so.[69]

Moreover, there was substantial evidence that Berkey suffered injury into 1971 as a result of the magicube conspiracy. Berkey was not able to introduce a magicube camera until late 1970, and even then its inventories remained low. Because of its haste, Berkey's original cameras were defective for some time. Where there is a basis on which a jury can reasonably infer significant antitrust injury, we should be very hesitant before determining that damages cannot be awarded. *Story Parchment*

**69.** By contrast, the jury awarded all but $4,000 of the claimed amount for 1970.

Co., supra, 282 U.S. at 561–62, 51 S.Ct. 248. On a motion for judgment n. o. v., the evidence must be viewed in the light most favorable to the party for whom the verdict was rendered, and it must be given the benefit of all reasonable inferences. *E. g., Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir. 1970). In our view, Judge Frankel gave insufficient weight to this standard.

■ The trial judge's decision, however, clearly represented a legitimate concern over the size of the award. It may be true, as the jury evidently found, that most Everflash buyers would have bought a magicube camera in 1972 had the strobe camera not become suddenly successful. It does not necessarily follow, however, that the magicube camera selected by most of those consumers would likely have been, as Berkey's damages theory seems to assume, a Keystone model. Accordingly, if Judge Frankel had merely ordered a remittitur on the ground that the award was excessive, we could not say that he had abused his discretion. *See Heyman v. Kline*, 456 F.2d 123, 130–31 (2d Cir. 1972). As it is, however, we reverse the grant of judgment n. o. v. and remand for retrial the question of damages for lost camera sales in 1971. In this instance, as in the others where we have directed a new trial, we hope the parties will find another means of disposition.

## VI. THE PECK INCIDENT

The lengthy proceedings below were unfortunately marred by a bizarre series of events in the closing days of the trial on liability. Berkey charged that one of Kodak's attorneys had joined forces with an important witness to destroy or conceal evidence unfavorable to the defense. As the facts unfolded at several side bar conferences, the district judge granted Berkey permission to attempt to impeach the witness by cross-examining him concerning the alleged concealment. Kodak challenges this ruling, asserting irreparable prejudice in the eyes of the jury due to the tale that ultimately unfolded from the witness stand. In addition, also on grounds of prejudice, it attacks Judge Frankel's decision to admit into evidence a 1915 decision entered against Kodak in a Government antitrust suit. To explain why we believe the district judge did not abuse his broad discretion in ruling on these matters, we must set forth the events in greater detail.

Professor Merton J. Peck, a former chairman of the Yale Economics Department, was Kodak's sole expert witness. His task was to explain Kodak's view of the relevant markets and the reasons for Kodak's persistently high market shares. In April 1977, several weeks before the trial began, Berkey availed itself of the right to depose its adversary's expert witness under Fed.R. Civ.P. 26(b)(4). Pursuant to a ruling by Magistrate Sol Schreiber, Mahlon Perkins, a Kodak attorney, furnished Berkey with several documents before the deposition commenced. These consisted of interim reports that Peck had drafted, along with Peck's appointment book for the first four months of 1977, the time sheets he kept while working as a consultant to Kodak, and a three-page summary of the materials supplied by Kodak that Peck had reviewed in preparing for his testimony. At the deposition, which was held at the offices of Berkey's counsel, Perkins represented in Peck's presence that all of the information and data upon which the witness had relied was now available to Berkey, and that there was no record of those documents Peck had read but did not utilize.

In the course of the deposition it came to light that Peck had periodically forwarded all his own notes and papers to Donovan Leisure Newton & Irvine, the law firm then representing Kodak. He explained that he had done so because the materials were covered by a confidentiality order and because he lacked the requisite storage space. Perkins then represented to Berkey that all of these documents had been destroyed—evidently before the magistrate's order—under his personal supervision. Peck averred that he could not recall when he first became aware that the documents were being destroyed, but that he continued to return material to Perkins's firm after learning that it was not being retained.

In another pretrial maneuver, Berkey sought an advisory ruling as to the admissibility of the district court opinion in *United States v. Eastman Kodak Co.*, 226 F. 62 (W.D.N.Y.1915), *appeal dismissed*, 255 U.S. 578, 41 S.Ct. 321, 65 L.Ed. 795 (1921). In that decision, somewhat inaccurately referred to throughout this litigation as "the 1915 decree," Kodak was found to have monopolized the amateur camera, film, and paper industries through acquisitions and other exclusionary practices. Judge Frankel ruled that the "decree" was too ancient to be probative of the current structure of the relevant markets, and that its value would be outweighed by the danger that the jury would give excessive weight to a judicial holding. *See* Fed.R.Evid. 403. The judge indicated, however, that he would reassess this decision should Kodak raise the defense that monopoly power had been "thrust upon" it.

Peck took the stand as the final witness for Kodak at the liability trial. When John Doar, lead trial counsel for Kodak and a man of national repute, asked him to explain how Kodak had obtained its market power, Alvin Stein, who has represented Berkey from the inception of this litigation, immediately asked for a conference at side bar. He argued that if Peck were allowed to testify that Kodak's strength was drawn from its innovative capacities, Berkey should be permitted to introduce the 1915 "decree," both as substantive rebuttal evidence and to impeach Peck. Judge Frankel twice offered to permit Mr. Doar to withdraw the question. When Kodak's counsel declined the invitation, the court ruled that the 1915 "decree" could be admitted as background only, representing "one source, though it is far in the past, of Kodak's power over the years." But, as Mr. Stein commenced his cross-examination of Peck, Judge Frankel reversed his course, deciding that, even considering the need to impeach Peck, the prejudicial potential of the decree overwhelmed its probative value.

On Friday, January 6, the 109th day of trial, Mr. Doar requested a ruling as to the scope of the cross-examination concerning the nonproduction and purported destruc-

tion of Peck's work papers. Judge Frankel responded by noting that it was irrelevant to Peck's credibility whether Kodak documents that the expert had testified he merely studied and returned to defense counsel had been destroyed. The court ruled, however, that if Peck had yielded his own papers to counsel with knowledge that they might be destroyed, this fact would certainly bear on the weight of his testimony. Stein was admonished to be "low key, brief, and to the point" on cross-examination.

Mr. Stein then began to question Peck about his preparation of a memorandum dated April 21, 1975, the earliest report over his name that had been produced at the deposition. When Stein inquired if this was the earliest writing Peck had prepared for Kodak, the economist replied in the negative. The jury was excused as Kodak for the first time produced a letter dated November 25, 1974, from Peck to a member of the team of Kodak attorneys. The contents of the document, marked as PX 666, were stunning, for in it Peck admitted that he had not yet formulated a fully persuasive answer to two questions:

1. On what economic grounds can the 1915 court decision be rejected as irrelevant to the present situation?

2. On what economic grounds can the argument that Kodak's dominant position since 1915 is not based on superior skills be rejected?

In short, the missive, which examined various aspects of the 1915 "decree," conceded that the anticompetitive conduct found in the court's opinion could not be ruled out as at least a partial explanation of Kodak's present market position. Attempting to explain why this explosive document had not been produced earlier, Doar stated that he did not believe it was within the scope of Magistrate Schreiber's order. Kodak had therefore never acknowledged that the letter existed.

Mr. Stein, of course, immediately requested permission to delve into Peck's knowledge of the circumstances surrounding the

concealment and sudden appearance of the letter. Counsel also renewed his request that the 1915 "decree" itself be admitted into evidence to rebut Peck's assertions. Since Kodak's own expert had indicated that it might be relevant to the present day market, Judge Frankel admitted portions of the "decree" and ruled that Stein could inquire of Peck how it had come about that he had overlooked PX 666 when he stated in his deposition that he did not recall having written any letters prior to April 1975. Peck replied that he had forgotten that the letter existed. Stein then read excerpts from Peck's deposition testimony, establishing before the jury that Peck continued to send materials to Donovan Leisure after learning that they were not being preserved.

But the most striking revelation of all was still to come. Judge Frankel asked Kodak's counsel to search its files over the weekend of January 7–8 for any other relevant documents. On Monday morning, out of the presence of the jury, Mr. Doar made known his discovery that in fact all the documents that Perkins told Berkey had been destroyed still existed. Moreover, Peck, who had steadfastly maintained that his own files on the case were empty, discovered during the weekend copies of two documents—including PX 666—that he had forwarded to Kodak's attorneys. Expressing his concern over the "delicate and troublesome" issues raised by these disclosures, Judge Frankel advised the attorneys that he believed the incident bore on Peck's credibility. Accordingly, he ruled that Mr. Stein should now be permitted to cross-examine Peck on his relations with Perkins.

Stein questioned Peck in some detail. Although the economist steadfastly denied he had deliberately concealed the fact that he had studied the 1915 decision, he conceded that Berkey was kept in ignorance of the fact. Peck agreed that a Kodak attorney had probably shown him the three-page summary of the documents on which he relied before it was submitted to Berkey at his deposition. The 1915 "decree" was not on the list. At the time of Peck's deposition, Stein pointed out, the professor had

failed to recall the existence of PX 666 and had denied retaining copies of any of his working papers—although his weekend search had uncovered a copy of the letter, which referred throughout to the Western District decision.

Stein also inquired into the circumstances of Peck's delivery of his papers to Perkins, and established that the material was sent to Perkins with impending discovery proceedings in mind, rather than merely because of the confidential nature of the documents. Additionally, Stein established that, although Peck had stated in his deposition of April 1977 that he did not recall when he first learned that documents were being destroyed, in fact he had discovered this fact only weeks before he was deposed. Counsel then went on to question Peck about the decree and its bearing on his testimony concerning the origins of Kodak's market position.

■ Kodak argues that Judge Frankel committed prejudicial error in allowing even limited reference to the 1915 court "decree," and *a fortiori* in permitting cross-examination of Peck on the subject of the alleged destruction of documents. But because the scope of cross-examination, especially when it pertains to the credibility of witnesses, is peculiarly within the province of the trial court, see *Lewis v. Baker*, 526 F.2d 470, 475 (2d Cir. 1975), and in light of the exceptional circumstances we have recited, we cannot say that Judge Frankel's rulings constituted an abuse of discretion.

As the trial court's continuing efforts to reassess the balance of prejudice and probative value of the 1915 "decree" attest, this question was not susceptible of facile resolution. But we think it clear that when PX 666 came to light the scales were decidedly tipped in favor of the limited admissibility that he approved. The Peck letter demonstrated that Kodak's lone expert witness had seriously considered the relevance of the market activities described in the 1915 "decree" to the present market structure of the industry, and that he had serious doubts whether the violations found there could be

safely characterized as irrelevant to Kodak's current power in the marketplace.

We are also of the view that the cross-examination of Peck remained within permissible channels, particularly in light of the extraordinary revelations that preceded it. Peck conceded at his deposition that he continued to forward research materials to Kodak's lawyers after learning they were destroyed upon receipt, thereby providing more than a sufficient threshold showing of relevance to permit further inquiry on cross-examination. Suspicion could only have been increased by the sudden appearance of PX 666, a letter of great importance to Berkey's efforts to impeach Peck, which the writer claimed to have forgotten existed. And when Peck revealed on Monday that his files had contained a copy of this letter from the outset, deeper inquiry was certainly justified. As each new fact came to light, Judge Frankel carefully reassessed its relevance to Peck's credibility and gradually enlarged the scope of permissible inquiry into the witness's actions.

Mr. Stein's questions, therefore, far from consisting of the mere compendium of inflammatory rhetoric that Kodak describes, were legitimate challenges to Peck's credibility and to the independence of his judgment.[70] Indeed, Judge Frankel, who throughout the unusual disclosures describ-

ed here maintained an attitude of cautious restraint, noted in a colloquy with the attorneys that Peck's credibility had, in his judgment, been destroyed on the witness stand. To be sure, the jury need not have believed Berkey's argument that Peck had deliberately collaborated with Perkins in an effort to destroy or conceal documents unfavorable to Kodak's cause. But there was certainly more than an adequate basis to permit Berkey to contend that this inference was justified, and that, at best, Peck was a willing tool of Kodak.

■ We are not unmindful that the incidents described, as presented to the jury, led to the unfortunate consequence of casting Kodak's attorneys, and the defendant itself, in a highly unfavorable light. It is no less true, however, that the cross-examination elicited information that was highly relevant to an assessment of the independence of judgment and probity of one of Kodak's principal witnesses.[71] Where the trial judge has taken great care to balance the probative value of the evidence against the prejudice that may accrue from its introduction, we think it inappropriate to substitute our judgment for his. See Perel v. Vanderford, 547 F.2d 278 (5th Cir. 1977); Hood v. United States, 125 U.S.App.D.C. 16, 365 F.2d 949, 951–52 (1966).[72]

70. A careful reading of the transcript reveals one brief interchange that was not relevant to Peck's own veracity, but only to that of Perkins himself. Peck was asked if he now was aware of the falsity of the representations Perkins made to Berkey that all the expert's papers had been destroyed. Peck replied that he did know this. Although we believe that the reference to Perkin's dissembling and Peck's present knowledge of it was immaterial, we do not think that this dialogue, or the reference to it in Mr. Stein's summation, was so prejudicial as to warrant a new trial. It was proper to argue to the jury that Peck played a role in the attempt to conceal information from Berkey, and to urge the jury to infer that Peck was either aware, or consciously chose not to recognize, that material was not in fact being destroyed, but withheld. The sole additional fact that it was Perkins who actively misrepresented the facts to Berkey was, at worst, incremental. We do not think that Kodak has met its heavy burden of demonstrating that this interchange, standing alone, caused it prejudice so severe as to call for reversal. See, e. g., Gray v. Shell Oil

Co., 469 F.2d 742, 751–52 (9th Cir. 1972), cert. denied, 412 U.S. 943, 93 S.Ct. 2773, 37 L.Ed.2d 403 (1973).

71. See Walker v. Firestone Tire & Rubber Co., 412 F.2d 60 (2d Cir. 1969) (expert may be cross examined concerning falsity of testimony in earlier unrelated trial).

72. We have examined Kodak's other objections to the conduct of the trial and believe they are without merit. We also find insubstantial Kodak's contentions that the Sherman Act and the treble damages provision of the Clayton Act are unconstitutional on their face. Moreover, we do not think that our interpretation of the former statute has effected a fundamental alteration of the law of monopolization. Accordingly, we reject the view that the Sherman Act is unconstitutional as applied to the facts of this suit. See generally Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 495–502, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968).

## VII. ATTORNEYS' FEES AND COSTS

Under Section 4 of the Clayton Act, 15 U.S.C. § 15, the successful plaintiff in a suit for treble damages may be awarded reasonable attorneys' fees. Judge Frankel awarded $5.3 million in counsel fees, calculated essentially on the hourly rate at which counsel agreed to bill their client. Berkey, which had asked for a fee of over $30 million, contends that because the trial court failed to take into account the difficulty of the litigation, the employment opportunities foregone by counsel, and the result achieved, the reduction of its request was arbitrary and must be reconsidered by this court. Judge Frankel's computation appears to be in conformity with the agreement between Berkey and Parker Chapin Flattau & Klimpl, its principal counsel in this case.[73] And were it not for our holdings on appeal we would be inclined not to disturb this award.[74] But inasmuch as we have reversed the judgment for Berkey on its single most significant claim, and have remanded other claims for a new trial, it is plain that the award of attorneys' fees must be vacated for reconsideration by the district court.[75]

**73.** In a letter dated March 4, 1976, Mr. Stein of Parker Chapin wrote to co-counsel that "the client has no commitment to any of the firms representing it in the case to pay a contingent fee or to compensate us on any measure other than time and effort expended." Moreover, despite the trial court's repeated requests, counsel failed to provide any information from which the judge could determine the size of the "success premium" Berkey allegedly agreed to pay its law firm.

**74.** Because of the conclusions we have reached on appeal, we have decided not to award costs to either party.

**75.** Since the question was neither briefed nor argued, we do not decide under what circumstances a court may award fees for time expended by counsel on claims that ultimately prove unsuccessful. *Compare Union Leader Corp. v. Newspapers of New England, Inc.*, 218 F.Supp. 490, 493 (D.Mass.1963), *set aside on other grounds sub nom. Haverhill Gazette Co. v. Union Leader Corp.*, 333 F.2d 798 (1st Cir.), *cert. denied*, 379 U.S. 931, 85 S.Ct. 329, 13 L.Ed.2d 343 (1964) *with Trans World Airlines, Inc. v. Hughes*, 312 F.Supp. 478, 483 (S.D.N.Y. 1970), *modified on other grounds*, 449 F.2d 51

## VIII. SUMMARY

The disposition of this appeal may be summarized in schematic form as follows:

| The Court below | This Court's holding |
| --- | --- |
| 1. Awarded Berkey $45,750,000 treble damages for lost profits on 110 cameras. | Reversed. |
| 2. Awarded Berkey $167,100 treble damages for lost photo-finishing profits. | Reversed and remanded for a new trial. |
| 3. Awarded Berkey $57,000 treble damages for excessive prices paid for photofinishing equipmemt. | Reversed and remanded for a new trial. |
| 4. Awarded Berkey $34,500,000 treble damages for excessive prices paid for film. | Reversed and remanded for a new trial. |
| 5. Granted judgment n.o.v. to Kodak on Berkey's claim for damages for excess prices paid for color print paper ($8,803,000, pretrebling, awarded by the jury). | Reversed and remanded for a new trial. |
| 6. Held that Kodak has violated § 1 of the Sherman Act by conspiring with Sylvania and General Electric in the introduction of the magicube and flip-flash systems. | Affirmed. Because the flip-flash conspiracy was not made a separate subject of damages at the first trial, a retrial is necessary to determine the resultant damages. |
| 7. Awarded Berkey $990,000 treble damages for lost camera sales in 1970 resulting from the magicube conspiracy. | Affirmed. |

(2d Cir. 1971), *rev'd on other grounds*, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973) *and L. Sullivan supra*, at 794.

Judge Frankel also awarded Berkey $343,-794.97 in costs, comprising court costs taxable under 28 U.S.C. § 1920, and certain expenses incurred in taking depositions. This award must also be vacated and reconsidered by the district court. We do make two observations for the guidance of the court below. Berkey's contention that the trial court erred in refusing to allow reimbursement for expert witness fees is clearly foreclosed by our decision in *Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 81 (2d Cir. 1971), *rev'd on other grounds*, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973), in which we indicated that the only costs recoverable by a successful plaintiff in a private antitrust suit are those normally allowable under 28 U.S.C. § 1920 and Fed.R.Civ.P. 54(d). *Accord, Twentieth Century Fox Film Corp. v. Goldwyn*, 328 F.2d 190, 224 (9th Cir.), *cert. denied*, 379 U.S. 880, 85 S.Ct. 143, 13 L.Ed.2d 87 (1964). Similarly, Berkey may not recover as costs of suit its expenditures for use of a computer retrieval service.

| The Court below | This Court's holding |
|---|---|
| 8. Granted Kodak judgment n.o.v. on Berkey's claim for damages in 1971 arising from the same conspiracy ($1,417,330, pre-trebling, awarded by the jury). | Reversed and remanded for a new trial on damages only. |
| 9. Granted Berkey equitable relief. | Vacated and remanded for further proceedings consistent with this opinion. |
| 10. Awarded Berkey attorneys fees and costs of $5,627,209.47. | Vacated for further consideration on remand. |